MICHAEL MURPHY v. METROPOLITAN LIFE INSURANCE COMPANY.[1]

November 20, 1908.

Nos. 15,812—(96).

**Insurance Conditioned on Health.**

Action on a life insurance policy which contained the condition following: "Provided, however, that no obligation is assumed by the company prior to the date hereof, nor unless on said date the insured is alive and in sound health." Verdict directed for the defendant on the ground that the insured was not in sound health. *Held*:

1. The defendant's promise is conditional. It is the fact of the sound health of the insured which determines the liability of the defendant, not his apparent health, or his or any one's opinion or belief that he was in sound health.

**"Sound Health" Defined.**

2. The term "sound health," as it is used in the policy, does not mean perfect health, but an absence of any disease that has a direct tendency to shorten life.

**Defense of Unsound Health.**

3. The evidence herein is practically conclusive that the insured was not in sound health when the policy was issued, but that he was then afflicted with cancer. The defendant did not waive the defense of unsound health. There was a previous medical examination of the insured in this case within the meaning of section 1693, R. L. 1905, and that section has here no application.

Action in the municipal court of Minneapolis to recover $105 upon a life insurance policy. The case was tried before Waite, J., who directed a verdict in favor of defendant. From an order denying his motion for a new trial, plaintiff appealed. Affirmed.

*Paul J. Thompson* and *August Savela,* for appellant.

*Snyder & Gale,* for respondent.

START, C. J.

This action was brought in the municipal court of the city of Minneapolis to recover from the defendant $105, which the plaintiff claimed was due to him from the defendant upon its life insurance policy, whereby it agreed to pay such sum to the plaintiff as the father and

[1] Reported in 118 N. W. 355.

beneficiary of Edward Murphy in case of his death after one year. The complaint alleged the execution of the policy and the death of the insured. The answer pleaded a breach of the condition in the policy, which was in the words following: "Provided, however, that no obligation is assumed by the company prior to the date hereof, nor unless on said date the insured is alive and in sound health." The reply admitted the condition, but denied any breach thereof, and alleged that the defendant was fully advised by its medical examiner of the true physical condition of the deceased before it issued the policy. At the close of the evidence, the trial court instructed the jury to return a verdict for the defendant on the ground that the evidence was practically conclusive that the deceased was not in sound health at the date of the policy. The plaintiff appealed from an order denying his motion for a new trial.

No question arises in this case upon any representation or warranty by or on behalf of the insured in the application for insurance, for the policy on its face states that it is issued upon an application which omits the warranty usually contained in applications and contains the entire agreement between the company and the insured and the holder and owner thereof. The defense is based upon the express provision of the policy that no obligation is assumed by the defendant company, unless on the date of the policy the assured is alive and in sound health. It is clear from the language of the policy that the defendant's promise of insurance was not absolute, but conditional, and that the existence of life and sound health in the insured on the date of the policy is the condition upon which the promise is made. It is the fact of the sound health of the insured which determines the liability of the defendant, not his apparent health, or his or any one's opinion or belief that he was in sound health. Therefore, if the insured was not in fact in sound health on the date of the policy, the defendant is not liable unless it has waived the defense. The burden of alleging and proving such fact was on the defendant. This, for practical reasons, has become the settled law of this state. Chambers v. Northwestern Mut. Life Ins. Co., 64 Minn. 495, 67 N. W. 367, 58 Am. St. 549.

The pivotal question, then, in this case is whether the evidence, as disclosed by the record, is practically conclusive that the insured was

not in sound health at the time the policy was issued. The term "sound health," as it is used in this policy, does not mean perfect health, but an absence of any disease that has a direct tendency to shorten life. Elliott, Ins. § 375; 7 Words & Phrases, 6554.

The medical evidence relative to the state of the insured's health on and prior to May 7, 1906, the date of the policy, may be summarized as follows: The physician who treated the boy, Dr. Cosman, testified to the effect: That he had been in the practice of his profession for twenty two years. That he first treated Edward Murphy, the insured, on April 23, 1906, and found his symptoms to be a little swelling and soreness in the knee which hurt him when he walked There was no abrasion or cut of the knee. The skin was intact all around. That he saw the boy two or three times a week after that until June 7, when he put the knee in a cast, which was taken off the latter part of June. That the treatment was continued at the boy's home until he went to the hospital some time in August, where his leg was amputated above the knee; and, further that "from my treatment of the case and diagnosis the boy was suffering with cancer of the knee during the months of May, June, July, and August up to the time of this amputation. The scientific name for it is carcinoma, or a carcinoma shirrus condition of the knee. This cancerous condition evidently existed, in fact, from the time the boy first called on me at my office on April 23, 1906. This disease of cancer for which the limb was finally amputated was steadily progressing from the day the boy first called on me. On April 23, and the several times he called on me immediately following that and prior to May 7th there was this cancerous beginning of the growth. * * * The amputation was done, of course, to stop the growth and to save the boy's life. That is what it was for. If it had been successful, it would have saved his life. The conditions which I have described as existing in the summer of 1906 and in April and May of that year impaired, or tended to impair, the condition of the boy. Those cancerous conditions at that time tended to shorten his life. * * * I did not on June 7 discover that this was sarcoma. It was not diagnosed as sarcoma until he went to the hospital. That was after the cast had been put on. He went to the hospital in August. They diagnosed it at the hospital as sarcoma."

Dr. Litchfield, the house physician at the hospital, testified that the boy was brought there August 20, or 21, 1906; that his case was diagnosed as sarcoma of the knee, a malignant tumor which tends toward death and ultimately ends in death; that sarcoma is called cancer by people generally, but technically it is not; and, further, that "from my examination of the boy at the time he was in the hospital I don't think I could state definitely the length of time the disease had existed in the boy's leg or knee. I should say it had been growing within a year. The shortest limit to the best of my judgment would be a couple of months. It might have existed a year, or it might have existed two months. This sarcoma of the knee undermines the constitution. It tends to shorten life. * * * In case of sarcoma of the knee the growth of the malignant tumor would be a continuous one. If it is a sarcoma, it is a sarcoma from the start. It does not develop into it. The outward appearances at the start— the symptoms are swelling, redness, hard and indurated."

Dr. McDougald, the defendant's medical inspector, testified: That he saw Edward Murphy, the insured, on April 27, 1906, and his attention was not called to any trouble of the knee; and, further, as follows: "I did not make an examination of his heart on that day. I did not make an examination of the urine. I did not make an examination of his lungs. I did not have the boy strip off his clothing. I did not examine his limbs. I did not look at his knee particularly. I had him walk before me. I examined his eyes. I did not discover anything wrong or unsound in the boy at that time to the best of my recollection. I made this written report that is in that exhibit at the time of the call. * * * I know that the statements contained in that report are true and correct. I know that of my own knowledge. I did not know at that time that the boy had sarcoma of the knee. At my examination at that time I found him to be in good health, so far as this examination goes. * * * The nature of my inspection in this case is, watch the boy in standing, walking, walk back and forth, notice whether there are earmarks of disease that we look out for, any deformity or lameness, or loss of an eye, loss of a finger or any of the things that might strike me if I saw them, but I don't think of them now."

In the report referred to the doctor expressed the opinion that the health of the insured was good and his constitution sound. The plain-

tiff, the father of the insured, testified that prior to the date of the policy the boy's general health was good. The boy died September 14, 1907, but there was no direct evidence as to the cause of his death. It is clear that if the insured at the date of the policy was afflicted with an organic disease, either sarcoma or cancer, he was not then in sound health within the meaning of the policy. There is no substantial conflict in the evidence on this point.

It is claimed, however, on behalf of the plaintiff, that his testimony and that of Dr. McDougald make the evidence conflicting. The conflict is apparent only. The point of external manifestation of the disease, if it existed, was the boy's knee, which was not examined by Dr. McDougald, and his testimony, that he found the boy in good health so far as the examination went, in no way contradicts or modifies the testimony of the other physicians. This is also true of the testimony of the plaintiff that the boy's general health was good. The testimony of the other physicians related directly to the condition of the boy's knee and the cause of such condition. Their testimony was not wholly opinion evidence, for they respectively testified to facts relating to the condition of the knee and the development of the disease. There is no contradiction, direct or indirect, of the testimony of either of them, nor is the evidence inherently improbable; on the contrary, it seems reasonable. Neither the judge nor the jury could arbitrarily reject the testimony of the two physicians as to facts or as to their professional opinion based thereon. A fair consideration of their testimony so directly leads to the conclusion that the insured, when the policy was issued, had a malignant disease generally known as cancer, that the court would have been bound to set aside any verdict to the effect that he was then in sound health.

The plaintiff claims that the defendant was precluded from asserting the defense that the insured was not in sound health by reason of the statute (R. L. 1905, § 1693), which provides that: "In any claim upon a policy issued in this state without previous medical examination * * * the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding upon the company, unless wilfully false or intentionally misleading." The purpose and meaning of this provision is not quite clear, but it is not necessary to here construe it, for it has no applica-

tion to the facts of this case because there was a previous medical examination of the insured.

Counsel for plaintiff seems to claim that it was a question of fact for the jury whether Dr. McDougald made an examination of the insured. The reply alleges that the defendant's medical examiner did prior to the date of the policy fully examine the physical condition of the insured.

We hold upon the undisputed evidence as to what the doctor did that there was a previous medical examination. The further claim of the plaintiff that the defendant waived the defense of unsound health finds no support in the evidence for it does not tend to show that the defendant had any knowledge of the insured's knee trouble before the policy was issued. The trial court correctly directed a verdict for the defendant.

Order affirmed.

JAGGARD, J.

I dissent.