### AMERICAN NAT. INS. CO. v. MELTON et al.
### No. 9328.

Court of Civil Appeals of Texas. Galveston.
Oct. 17, 1929.

Frank S. Anderson, of Galveston, and Kennerly, Williams, Lee, Hill & Sears and W. H. Blades, all of Houston, for appellant.

Geo. W. Dixon, of Houston, for appellees.

GRAVES, J.

This appeal by the insurance company is from a judgment against it in favor of appellee, Mrs. Melton, for $500, with 6 per cent. interest and a 12 per cent. penalty for nonpayment, upon a policy issued by it under date of March 22, 1926, upon the life of Mrs. Maggie Wiggins, in which Mrs. Melton was named as beneficiary. The policy, issued upon an application which omitted the warranty usually contained therein, embraced the entire agreement between the company and the insured, and contained this provision: "Provided, however, that no obligation is assumed by the Company prior to the date hereof, nor unless on said date the Insured is alive and in sound health."

The judgment followed the submission of the cause to a jury and its affirmative answer to the special issue, "Was the deceased, Maggie Wiggins, in sound health on March 22, 1926?" to which there was appended this definition:

"In this connection you are charged that:

" 'Sound health' means a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, not a mere temporary indisposition, which does not tend to weaken or undermine the constitution of the assured. Sound health means freedom from serious disease, or grave, important, weighty trouble." ·

No objection was made by either party to the quoted definition, but the appellant challenges in this court the adverse recovery upon the ground, among others, that the verdict of the jury answering the special issue, "She was," is so against the great weight and preponderance of the evidence as to be clearly wrong.

■ This contention must be sustained. The appellees declared upon the policy so dated, basing their action solely upon the contract of insurance thereby evidenced, although they sought to contend that the policy had been delivered to the deceased on the 15th day of March, 1926, rather than upon its date, March 22, 1926. This, however, was shown to be an immaterial matter, since the written receipt from the company of the initial payment of the premium on the policy of date March 8, 1926, covered advanced premiums thereon for the two weeks intervening between that date and March 22d following, with provision that the policy itself might be thereafter issued and delivered to the applicant, provided she was then alive and in sound health, at any time within four weeks thereafter. Thus the appellees were bound by their declarations upon the policy as issued and dated, and by the trial court's fixing that as the time of the inquiry submitted to the jury, especially as they did not object to the special issue on that ground.

The question of whether or not the insured, Maggie Wiggins, was in sound health is therefore referable solely to the date of the policy, March 22, 1926. If at that particular time she had any such serious condition as the trial court's so acquiesced in definition comprehends, with which this court, subject to its own hereinafter stated interpretation of it, finds no fault, the policy never became effective as a contract of insurance, under its express terms. While the evidence on the issue was in conflict, the weight of that against the finding made by the jury seems to this court so strong that, in the exercise of its peculiar province, it is unable to affirm the judgment based thereon.

■ As applied to contracts of life insurance, we think there should also, in addition to the elements so defined by the trial court, be read into the terms "in sound health" at the time of the delivery of the policy a mutual contemplation of something material to what the parties are contracting about, or to the risk thereby being assumed; that is, such a then existing infirmity as does thereafter constitute at least a contributing cause thereof, should death ensue during the life of the contract.

■ So construing the scope of the quoted stipulation, the state of the evidence, in view of a reversal, will be only briefly outlined.

These facts undisputedly appeared: Mrs. Wiggins, accompanied by Mrs. Melton, the appellee, who was her sister and beneficiary under the policy in suit, went to the office of Dr. Barnes in Houston about March 14, 1926. He examined her at that time, finding a tu-

mor which he testified on this trial "filled the vagina, was bleeding, and causing her considerable pain." He called Mrs. Melton into the room to look at it, and she testified about the matter: "When I went in there I saw a little tumor; I saw an object between the size of a nickel and a quarter, I suppose, and it was a gray object. I do not know what a fibroid tumor is. I do not know what a tumor of the vagina is."

About March 17, 1926, Mrs. Wiggins quit work at the laundry where she had uninterruptedly been serving for more than two years, complaining to her employer that she was sick, and on the next day, March 18, 1926, was operated on at a hospital, Dr. Barnes removing the tumor already found from the vaginal tract. After remaining in the hospital under treatment for several days, she was discharged on his orders on March 21, 1926, and returned with Mrs. Melton to the latter's home, where she lived. She never thereafter returned to work at the laundry, but did attend to her household duties around her sister's home. Dr. Barnes never saw her any more.

She died at Beaumont, Tex., August 27, 1926, under medical attendance of Dr. Sherrill, who issued certificates to that effect, therein reciting the immediate cause of her death to have been "cancer uterus," and the duration of her illness from it to have been "since July 15, 1926 (from personal knowledge): several months (from history of the case)."

Both Drs. Barnes and Sherrill pointedly testified that they had at the time of their several services to the insured positively diagnosed her trouble as cancer. Dr. Barnes' conclusion is summed up in these excerpts:

"Prior to the operation we did not know what the nature of this tumor was; it could have been one of several things, but upon the removal of it, we decided from the appearance of it that it was cancerous, and after submitting it to a microscopic examination by the pathologist of the hospital, we got a report in a few days that it was cancerous. Before she was operated on there was nothing that could be observed as to diseased organs; looking into the vaginal tract, a small portion only was to be seen, but just ordinarily there was nothing observable as to diseased organs. I will say I do not think she was in sound health any time during the month of March, 1926. * * * This was a cancerous tumor I took from Maggie Wiggins. * * * I am swearing that she had a cancer from the microscopic examination; I would hate to think I could not swear she had a cancer from my own knowledge, I am asked, unless I performed this pathological examination and passed upon it; just from the standpoint of medical science, I would be willing to swear that she had cancer, and

I will say I don't think it necessary for me to swear on a microscopic examination, however, one was made, but so far as my opinion goes, she had a cancer. So far as I am concerned I know she had a cancer, because she had all the appearances of a cancer; we know a lot of these growths by their appearance. This microscopic work is done as an informatory measure; a cancer is usually diagnosed long before there is a microscopic examination made, so far as the opinion of the operating surgeon is concerned. I first came to the conclusion that this was a cancer during the removal of it. It is customary to operate on a cancer and cut it out, that is the best treatment for cancer in medical practice and science.

"We knew after this operation was done that she could not recover. Prior to the operation we thought it might be a fibroid tumor in the process of being extruded, we thought that an operation would cure her, but after we found that it was malignant and found the extent of the inflammation of the surrounding tissues, we knew it could not be successful. I never told her that."

Dr. Sherrill, being at the moment under the recollection from memory alone that he began his treatment of her only about ten days before her death, testified:

"I diagnosed her case as inoperable cancer. I came to that conclusion just by looking at her and frequent examinations; I had no laboratory examination. I did not have any pathological test or anything of that sort at all. She was greatly emaciated, in a very serious condition, the first time I saw her. Of course it is my opinion—that is all I can say—that it was a cancer. Of course sometimes a pathological test won't show, I have had it fail; I have had cases that pathologists said was not cancer that went ahead and died with cancer in a very few weeks."

After having his memory refreshed from a written statement he had made at the time, he added, first saying that the death certificate and accompanying affidavit he had then made were correct:

"I prescribed for her the first time morphine, July 15th to August, that is right, just about six weeks. I had no idea it was that long. And in that I said the previous duration, from the history of the case, was several months. That is right. The certified copy of the death certificate shows the duration as eleven months. I would not say that is not true. I testified just now I thought I saw her several times during the last week or ten days. Her case was hopeless the first time I saw her. I said just now she had an inoperable cancer. When they come to a certain stage they cannot be operated, and we consider them inoperable. That is the reason I did not operate, in fact she was in

no condition to stand any kind of an operation. * * *

"If she was operated on in March for cancer I don't see how she could have been in good health, or sound health, any time during the month of March, 1926. * * *

"At that time she had a cancer, as I diagnosed it, of her female organs, which had destroyed the vagina and was protruding; I looked at it; I didn't feel any more than I could feel the mass in her abdomen, and it protruded out of her vulva, that is, there was some growth there; well, it looked raw, a cancerous looking growth to me—ulcerated. A cancer is a tumor. I don't know just what else it could have been. Fibroid tumors do not act like that."

These two were the only physicians ever shown to have either examined or treated the deceased, professionally. It is true that Dr. White, of equally high repute, was called to testify only as an expert, after having heard Dr. Barnes' testimony detailed from the witness stand. He had never seen the deceased, nor before known anything of her case. After outlining as prevailing some differences in the profession as to the treatment of known cases of cancer, and saying that the occurrence of cancer in a woman twenty-six years of age (that of the deceased) is very rare, he answered hypothetical questions by saying that, in his opinion, a person of such age who had recovered sufficiently from an operation for the removal of a growth—whether cancerous or not—to resume her normal duties, or travel around the state of Texas, apparently in comparative comfort, and died while so moving about, could not be said to have died from cancer, or from the effects of an operation for it.

This detracts little from the force of the quoted testimony from the other two doctors, it seems to us, because it was not only purely hypothetical but also based on an assumed state of facts that went far afield of those obtaining here.

He further expressed his opinions to be that "the only sudden termination or fatal termination of a cancer case would be from hemorrhage," and cancer cannot be diagnosed without a pathological and microscopic examination. You cannot tell whether or not it is cancer just by looking at it," but later qualified the latter by adding, "I mean by that statement, with scientific certainty."

On further development of his views, he also disclosed that he would, under actual care, treatment, and constant observation of a case, have his professional opinion as to whether or not it was cancer, without the aid of a pathological examination, which greatly reduced the real differences between himself and the other physicians.

Moreover, his quoted view that hemorrhage invariably attended a sudden or fatal termination of a cancer case sustained no readily perceptible relation to this woman's state of health at the time Dr. Barnes operated on her only two days prior to the date of the policy issued to her, but was elicited upon questions bearing on conditions existing at the time of her death five months later.

The other testimony tending toward any contradiction of that given by the attending physicians embodied statements of several nonprofessional persons as to the habits, activities, and appearance to them of the insured both before and after the date of the policy, but no one of them testified that she was in sound health at that time, nor was any one of them in position to know of the particular infirmity Dr. Barnes operated on her for.

This leaves only Mrs. Fargue, the nurse, who did give it as her opinion that Mrs. Wiggins could not have had cancer, either at the time of the operation by Dr. Barnes or at the time of her death when attended by Dr. Sherrill. She, however, had never made any physical examination of the insured, nor been present at one. She described herself as a practical nurse, saying in that connection: "I have never had any training in a hospital or medical school of any kind; I just do what the doctors tell me to do."

While she expressed the conclusion that a small fibroid tumor was not a serious ailment, she conceded that Mrs. Wiggins could not have been in really sound health on March 22d if even one of that sort had been removed from her on March 18th, explaining herself in this way: "When saying that she would not be sound, I mean by that she would not be in a state of perfection for awhile. It would be temporary, from which she would have a reasonable chance to recover."

▮ It is true the proof here seems to reasonably indicate that Mrs. Wiggins did not know she was not in sound health as therein specified on the date of her policy, if it be a fact that she was not, but that is immaterial, since the stipulation is valid and enforceable anyway, if such was the fact. Wright v. Federal Life Ins. Co. (Tex. Com. App.) 248 S. W. 326; Metropolitan Life Ins. Co. v. Howle, 62 Ohio St. 204, 56 N. E. 908; Id., 68 Ohio St. 614, 68 N. E. 4; Murphy v. Metropolitan Life Ins. Co., 106 Minn. 112, 118 N. W. 355.

Further discussion is deemed unnecessary, because the evidence, in our opinion, so strongly preponderates against the verdict as to make the recovery based thereon clearly wrong. The judgment will be reversed, and the cause remanded for another trial.

Reversed and remanded.