No. 25,603.

Augusta Pickens, *Appellee*, v. The Security Benefit Association, *Appellant*.

SYLLABUS BY THE COURT.

1. Benefit Insurance—*Suspension for Nonpayment of Dues—Reinstatement —Good Health a Requirement for Reinstatement.* By-laws of a fraternal beneficiary society permitted reinstatement of a member after suspension for nonpayment of dues, by payment of arrearages and dues within a grace period, provided the member was in good health, and payment for purpose of reinstatement constituted a warranty of good health. *Held,* good health in fact was required, and the requirement was not satisfied by appearance of good health or reasonable belief that the member was in good health.

2. Same—*By-law Forfeiting Membership Prospective in Operation.* A by-law providing that no person should be eligible to membership who had been convicted of felony and imprisoned in a penitentiary, considered, and held not to forfeit membership already existing.

3. SAME—*Proof of Good Health Not Waived by Custom.* Proof of a custom of the society to accept payments for purposes of reinstatement within a grace period did not establish a custom to accept such payments when the member was not in good health.

4. SAME—*Warranty of Good Health as a Condition to Reinstatement After Suspension—Estoppel.* The evidence considered, and *held,* the society was not estopped to insist on the warranty of good health as a condition to reinstatement after suspension.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed January 10, 1925. Reversed.

*Leonard S. Ferry,* of Topeka, for the appellant.

*Dennis Madden,* and *C. B. Randall,* both of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a beneficiary certificate issued by the national council of the Knights and Ladies of Security, predecessor of defendant, the Security Benefit Association. The plaintiff, Augusta Pickens, who had been named as beneficiary, recovered, and defendant appeals.

Dues were payable on the first day of each month. If not paid by the last day of the month, the member was automatically suspended. A member suspended for nonpayment of dues could be reinstated within sixty days from suspension by paying arrearages and dues, provided he was in good health at the time of making payment with the view of reinstatement. Payment for reinstatement constituted a warranty that the member was in good health at the time of making it, and retention of such payment could not have the effect of reinstating the member unless he was in good health. The beneficiary kept up the member's dues. It was customary for her to pay dues for the month in which payment was made, and arrearages for the preceding month. Dues for January, 1921, were not paid until February 17, when payment was made for the months of January and February. The member died on March 1. The defense to the action was that the member was not in good health on February 17, and having been suspended for nonpayment of January dues, he was not reinstated by the payment made in February.

The medical testimony gave the origin of the member's malady, which was multiple neuritis, and progress of the disease until it resulted in death through paralysis of the heart. The member was not well from February, 1920, until he died, March 1, 1921. During the

last two months of his life the attacks were more pronounced and closer together. The attending physician's card showed calls or treatment given nine times in January, 1921, eight times in February, up to and including February 24, and on February 26, 27, 28, and March 1. Another physician testified he examined the member in November, 1920, and found him suffering from multiple neuritis of traumatic origin, a disease from which a patient seldom recovers. The history of the case showed that on an occasion when the member was receiving discipline as an inmate of the penitentiary, he tried to squirm away from infliction of pain and injured one of his spinal vertebræ. The owner of the apartment in which the member lived observed him, and discussed with him the state of his health, within the last month or two of his life. The member would be seen to be groaning and carrying on, and the expression of his face and the movements of his body indicated great pain. He said the pains were unbearable. Plaintiff produced testimony of nonexpert witnesses that on occasions during February, 1921, and up to February 26, they saw the member, that he was bright and lively, ate heartily, made no complaint of illness, seemed to be in the best of health, and was in perfect physical health.

The court instructed the jury as follows, the portion of the instruction which is of special importance being italicised:

"As to the meaning of the words 'good health' as used in the laws of the defendant association, I will say that the term does not mean absolute perfection, but it is comparative. The insured member need not be entirely free from infirmity or from all the ills to which flesh is heir. *If he enjoys such health and strength as to justify the reasonable belief that he is free from derangement of organic functions, and to ordinary observation and outward appearance his health is reasonably such that he may with ordinary safety be insured and upon ordinary terms, then the requirement of good health is satisfied.* Slight troubles, temporary and light illness, infrequent and light attacks of illness, not of such a character as to produce bodily infirmities or serious impairment or derangement of vital organs, do not disprove the claim of good health. In other words, the term 'good health' as used in the manner set forth in the laws of the defendant association, means that the insured member has no grave, important or serious disease, and that he is free from any ailment that seriously affects the general soundness and healthfulness of his system."

The jury returned the following special findings:

"1. Was J. Sidney Pickens in good health on February 17, 1921? A. According to evidence, he was in good health on February 17, 1921.

. . . . . . . . . . . . . . .

"12. Had J. Sidney Pickens been subject to attacks of neuritis or multiple neuritis prior to February 17, 1921? A. No.

"13. Was the last illness of J. Sidney Pickens multiple neuritis or neuritis? A. Neither. Paralysis of the heart."

It will be observed that the jury accepted the medical testimony to this extent: The fatal illness was paralysis of the heart. The jury did not, however, accept the medical testimony as to the instant cause of paralysis of the heart, namely, multiple neuritis. There was no evidence whatever that multiple neuritis of traumatic origin, manifesting itself in attacks growing more frequent and violent, is not an efficient cause of paralysis of the heart, and the jury may very well have disregarded the expert testimony, and based its finding of good health on the nonexpert testimony, because of the portion of the instruction to which special attention has been directed. The contract did not provide that a member might be reinstated by payment of arrearages and dues provided he appeared to relatives and acquaintances to be in good health, and by hearty eating, display of good spirits, and noncomplaint of illness, induced reasonable belief that he was in good health. The contract was that he should be in good health, and payment of arrearage and dues with the view of reinstatement was a warranty of good health. Since the instruction permitted substitution of appearance to and belief of laymen respecting good health for the fact of good health, the instruction was erroneous, and under the circumstances was prejudicial.

The instruction, as applied to a similar state of facts, was condemned in the case of *Miller v. Knights and Ladies of Security,* 103 Kan. 579, 175 Pac. 397. In that case the full definition of good health was contained in two instructions. In one it was said good health means that a person is free from any disease or ailment which affects general soundness of the body or its organs or parts—substantially the concluding portion of the instruction given in the present case. In the other the appearance-and-belief doctrine was stated, substantially as in the instruction given in the present case. Reading together the two instructions in the Miller case, we have, with only immaterial variation in expression the instruction under review. In the Miller case the court expressly recognized the fact that good health does not mean absence of all infirmity, including absence of slight and temporary indispositions not usually affecting soundness of the system or materially weakening vigor of the constitution or seriously deranging vital functions. Likewise the court expressly recognized that evidence of corporeal appearance and con-

duct as indicative of good health, or lack of it, is relevant in determining the question of existence of good health. But the court pointed out that, to effect reinstatement under a warranty of good health, existence of good health as a fact is necessary, and that appearance and belief may not be substituted for the fact, because a person may unconsciously and without showing it be the subject of an insiduous disease, at the point of becoming fatal.

It is manifest that the instruction in the Miller case and the instruction in this case were adapted from 3 Joyce on Insurance, second edition, section 2004. The court had this section before it when it decided the Miller case. (Briefs, 103 Kan., volume 17.) The section is contained in a chapter relating to particular representations and warranties intended to be illustrative of principles set forth in preceding chapters. As a matter of fact, the good-health doctrine of section 2004 was developed in section 1849, relating to the opposite of good health—sickness and disease—where the comparative nature of the terms is stated. In discussing the subject of anwers to questions propounded relating to sickness and disease, the circumstances are stated under which answers may be based on such condition of health and strength as warrant a reasonable belief that health is good. The section concludes as follows:

"But, however, although one believes and affirms that he has not a disease, yet if the answers are made warranties, he answers at his peril. Neither his ignorance nor the immateriality of the fact concealed will aid him, and by numerous decisions, if he expressly stipulates that all his statements shall be material, the result would be substantially the same." (p. 3006.)

In section 1964 it is said:

"The rule is settled that if an affirmative warranty is false the contract is avoided, and the assured is not aided by the fact that there was no fraudulent intent on his part, or that it was not willfully but innocently made; and so it is immaterial whether the assured acted in good or bad faith, or whether he knew the statements to be untrue or not, or whether the answers were intentionally false or in accordance with his belief, or whether he believed them true or not." (p. 3227.)

In section 2003 it is said:

"In the determination of the effect of the very numerous statements as to health, illness, disease, etc., generally required in life insurance, the principal consideration is whether under the terms of the contract they are representations or warranties . . . " (p. 3306.)

The result is, reasonable belief in good health and appearance of good health may satisfy the requirements of good health when

the good faith of representations is under investigation, but not when good health is warranted. This was made clear in the opinion in the Miller case:

"Good health, and not the appearance thereof or the reasonable belief therein, was the essential condition in this case. . . . It was not a question of good faith, but one of actual good health, . . . In this instance, to entitle her to reinstatement, the member must, aside from slight troubles or infirmities not usually ending in serious consequences, have been in fact free from any disease or ailment which tended seriously or permanently to weaken or impair her constitution." (*Miller v. Knights and Ladies of Security*, 103 Kan. 579, 583, 175 Pac. 397.)

After referring to reliance of counsel for defendant on the Miller case, counsel for plaintiff say the instruction given in the present case was correct in point of legality, and follows the form extracted from the unbroken line of legal authorities in this country. The implication is that the instruction condemned in the Miller case was correct. If so, the decision in that case was wrong, something important, if true. Such of the decisions as counsel see fit to cite in support of their assertion may be examined.

In the case of *Barnes v. Mutual Life Ass'n*, 191 Pa. St. 618, an application for insurance made on October 30 contained a representation that the applicant was in good health. At the foot of the policy was a notation that it should not become binding until the first premium was paid, during the applicant's lifetime, and while he was in good health. The applicant contracted an ordinary cold on November 25, paid the first premium and received the policy on November 28, and died of pneumonia on the night of Thursday, November 30, following a severe chill on Wednesday evening. The trial court instructed the jury that a temporary or slight cold in a man of usual good health would not constitute unsound health. The jury found the applicant was in good health when the policy was delivered, which meant that the fatal disease, pneumonia, did not set in until after the policy was delivered. The evidence was conflicting on all material issues of fact. The supreme court said the jury was instructed correctly as to the meaning of the words "good health," and quoted Joyce's section 2004. The material portions of the syllabus read as follows:

"The term 'good health,' when used in a policy of life insurance, means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system. . . . *Held*, that it was for the jury, under proper instructions of the court as to what constitutes good health, to determine

whether he was in insurable good health, within the meaning of the representations contained in the application, at the time the insurance was consummated by payment of the premium."

The Barnes case was before this court when the Miller case was decided. The instruction given in the Barnes case was correct, and the case was well decided, but it threw no light on the matter in controversy in the Miller case.

The report of the case of *Goucher v. Northwestern Traveling Men's Ass'n,* 20 Fed. 596, consists of the charge to the jury in the trial of a case in the federal court. Representations relating to good health and serious illness were involved, and the essence of the long disquisition is well presented in the headnotes, which read as follows:

"A representation by an applicant for insurance that he is in possession of good health, means that he is free from apparent sensible disease and unconscious of any derangement of important organic functions.

" 'Severe illness' means such as has, or ordinarily does have, a permanent, detrimental effect upon the physical system.

"A false answer, made without qualification, to an inquiry as to a matter of fact, annuls the contract of insurance, whether the reply is designedly untrue or not."

The opinion of the court in the case of *Provident S. L. Assur. Soc. v. Beyer,* in 23 Ky. Law Rep. 2460, was withheld from publication in the official reports. Representations as to good health contained in an application for insurance were involved. Because of a statute, the application containing the representations was not legally admissible in evidence. It was, however, admitted without objection, and the court discussed the subject of good health and cited Joyce's section 2004. The headnote reads as follows:

"The statement that a party was in good health does not import that he was entirely free from infirmity, but simply that he was in reasonably good state of health, and that his life was such as might be insured with ordinary safety and upon common terms." (p. 2461.)

The case of *Hann v. National Union,* 97 Mich. 513, involved a warranty relating to good health. The warranty was that, to the best of the applicant's knowledge and belief, the statements he subscribed to were true. Concerning this warranty the court said:

"It cannot be said under such a statement that the applicant assumed, or attempted to assume, the whole risk of his answer being true. It is a statement that he believed he was in good health, and, to the best of his knowledge, his statement was true. It was therefore material whether the applicant knew of the existence of the disease or not." (p. 518.)

The syllabus of the case reads:

"In order to defeat a recovery upon a life insurance policy for the breach of a warranty by the assured that, to the best of his knowledge and belief, he was in good health when the application was made, the defendant must show that the applicant knew or had reason to believe that the warranty was untrue."

In this connection it may be observed that, in *O'Brien v. American Yeoman*, 183 Mich. 86, the court held that when the testimony of medical experts showed deceased was affected with tuberculosis at the time she made application for insurance, a verdict for the insurer should have been directed, when the only testimony disputing the expert testimony was that of lay witnesses who said the applicant was about the house, was doing housework, and looked and acted well.

The case of *McDermott v. Modern Woodmen*, 97 Mo. App. 636, involved a warranty relating to good health and freedom from disease. The material portions of the decision are well digested in the syllabus, which reads:

"The difference between the legal effect of a mere representation and a warranty is, that if the representation turns out to be substantially true as to facts material to the risk, the policy of insurance which it induced will be upheld, although the representation was false in unessential particulars; but a warranty must be strictly true, as it defines the limits of the obligations assumed by the insurer, and if it is false in any part, whether that part affects the risk or not, there can be no recovery on the contract.

"In the case at bar, the applicant answered the interrogatory as to whether he was of sound mental and physical health and free from disease or injury at the date of the application for insurance, in the affirmative, and it is asserted by the defendant that this answer was false, and the trial court instructed the jury that the meaning of the inquiry was whether or not the applicant have any grave, important or serious disease, whether he had a state of health free from disease or ailment which affected his general healthfulness and the soundness of his system, and that the inquiry did not embrace a temporary ailment or indisposition having no tendency to undermine or weaken the constitution: *Held*, that although the applicant had some slight temporary ailment, he could say with literal and exact truth that he was free from disease within the meaning of the interrogatories addressed to him." (¶¶ 5, 7.)

The case was well decided, and gives no countenance to the notion that a warranty of good health may be satisfied by anything except good health in fact.

Counsel for plaintiff cite Joyce's section 2004. It has been sufficiently discussed. Thus endeth counsel's unbroken line of authorities.

The decision in the Miller case is well sustained by authorities which are precisely pertinent.

In the case of *Trafton v. National Council, K. & L. of Security,* 198 Ill. App. 347, suspension for nonpayment of dues occurred on August 26. The medical testimony was that on August 28, the insured was suffering from a tumor, with symptoms which made removal necessary. The tumor was removed on August 30. Immediately after the operation the insured's heart began to fail, and she died on September 2. It was not controverted that the tumor had been growing for a period of at least several months prior to its removal. There was testimony to the effect that the insured appeared to be in good health on August 26. The abstract of the decision reads as follows:

"The words 'good health' in the rules of a fraternal insurance society with reference to reinstatement of a member mean that a person is in a reasonably good state of health and free from any disease or illness that tends seriously or permanently to weaken or impair the constitution, and such words do not refer to the appearance of good health." (p. 349.)

In the case of *Murphy v. Metropolitan Life Ins. Co.,* 106 Minn. 112, there was a warranty of good health in the form of a condition in the policy, dated May 7, 1906, that no obligation was assumed unless the insured was in good health on the day the policy was dated. There was medical testimony that on that day the insured was afflicted with sarcoma of the knee. The company's medical inspector had examined the insured on April 27, and testified he discovered nothing wrong or unsound about the insured, but found him in good health, so far as his examination disclosed. The inspector reported to the company that the health of the insured was good and his constitution was sound, and there was nonexpert testimony that his general health was good when the policy was issued. On this testimony a verdict was directed for the company. In approving the action of the trial court in directing a verdict, the supreme court said:

"It is clear from the language of the policy that the defendant's promise of insurance was not absolute, but conditional, and that the existence of life and sound health in the insured on the date of the policy is the condition upon which the promise is made. It is the fact of the sound health of the insured which determines the liability of the defendant, not his apparent health or his or any one's opinion or belief that he was in sound health." (p. 113.)

The court concludes that the Miller case was well decided, and that it rules the present case.

The member's certificate was dated April 11, 1911, and he agreed to abide by amendments of the association's laws. In 1912 an amendment was adopted that no person should be eligible to membership who had been convicted of felony and had been imprisoned in a penitentiary, reformatory, or other penal institution. Defendant offered evidence that the member had been an inmate of the boys' reform school at Topeka, and had been confined in the Kansas state penitentiary three times, the first on conviction of burglary committed in Lyon county, the second on conviction of grand larceny committed in Shawnee county, and the last time for a crime committed in Oklahoma. He was discharged from the last confinement on February 18, 1900. The evidence was rejected, and properly so. The amendment did not undertake to forfeit membership already existing, but looked to the future.

Plaintiff stresses custom of defendant to accept arrearages and dues for purpose of reinstatement within the sixty-day grace period. No custom to accept arrearages and dues when the member was not in good health was shown.

On the day the member died, dues for March became and were payable. As the result of conference with the financier of the local council, plaintiff paid the March dues on April 26. Proofs of death, showing cause of death and bad health on February 17, did not reach defendant's secretary until May 31. The jury found specially that previous to that time he did not know the state of the member's health on February 17. Dues were $3.50 per month, 20 cents of which belonged to the local council, and the remainder to defendant. Defendant denied liability on the policy because the member was not in good health, and returned to plaintiff $10 in currency, or 10 cents more than defendant had received of the January, February, and March dues. Plaintiff sent the money back, and defendant deposited in court $10.50 for her benefit. Plaintiff contends that, because defendant did not send or tender to her the full sum of $10.50, it is estopped to deny liability on the certificate. The abstract states the district court did not submit this ground of liability to the jury. So far as the abstract and the counter-abstract show, plaintiff was content, and she is not permitted to mend her hold here. Since, however, the subject may be agitated at another trial, it may be said the district court dealt with it properly. The member contracted that receipt and retention of dues after suspension, when he was not in good health, should not restore him or his beneficiary to any rights under the certificate. The contract protected

defendant until it was apprised of the fact the member was in bad health. Having knowledge of the fact the member was in bad health, defendant might, if it chose, waive the requirement of good health. When, however, defendant learned the member was in bad health, it denied liability on that ground, and restored to plaintiff all it had received. Conceding defendant was obliged to see that the 60 cents which the local council had received was repaid, defendant distinctly indicated its purpose not to keep plaintiff's money, and not to waive the requirement of good health, and plaintiff was neither deceived nor lulled into security by its conduct.

The judgment of the district court is reversed, and the cause is remanded for a new trial.