No. 29,453.

KATIE JAKLEVIC, *Plaintiff*, v. THE SUPREME LODGE OF THE FRATERNAL BROTHERHOOD, *Appellant*, JOHN MARTINAC, ANNA MEHRING, MARY BOJCZUK, ROSE SOPTICH, MILDRED BEAR, JOSEPH SOPTICH and PETER McCAN, *Appellees*.

(289 Pac. 467.)

Opinion filed July 5, 1930.

*James M. Meek*, of Kansas City, *Richard F. Allen*, of Topeka, and *Michael F. Shannon*, of Los Angeles, Cal., for the appellant.

*C. M. Gorrill*, of Kansas City, for the appellees.

The opinion of the court was delivered by

JOCHEMS, J.: This action was brought on a benefit certificate issued by a fraternal insurance society. The interveners recovered judgment, and defendant appeals.

The suit was originally brought by one Katie Jaklevic. The petition was filed on October 1, 1928, and alleged, in substance, that the plaintiff was named beneficiary in the policy; that she was a

first cousin of the insured, Mary Martinac; that Mary Martinac died on October 3, 1927, while a member of the defendant society in good standing; that plaintiff filed proper proofs of death and fully complied with all conditions of the certificate. A copy of the certificate was attached to the petition.

The defendant filed answer and cross petition in which it admitted the issuance of the certificate of membership, but denied that plaintiff came within any of the classes of persons who may become beneficiaries in the defendant society as provided in its by-laws. The defendant set up the various persons and classes of persons who might lawfully become beneficiaries, and alleged that plaintiff did not come within any of the various classes. The answer further pleaded a breach of warranty by the insured in that she made false answers to questions in the application for the certificate, the truthfulness of which was warranted by the statement appearing in the application. Questions and answers appearing in the application were set forth, and it was alleged that the insured answered such questions as follows:

"7. Have you ever had any sickness, accident or surgical operation? A. No. Give name and address of attending physician. A. None.

"9. Are you now . . . suffering from any disease? A. No.

"15. Have you ever been rejected, postponed or rated up for life, accident or health insurance, or have you had insurance canceled or renewal or reinstatement refused by this or any other company, society or association? A. No."

The answer further alleged that the replies given by the insured to these questions were false and untrue and known by her to be so, and further pleaded certain provisions of the application reading as follows:

"I have read the foregoing statements, and I warrant that they are full, complete and true. I agree that the truth of each shall be a condition precedent to any binding contract issued to me hereon. I further agree that inasmuch as the supreme officers of the society alone have authority to determine whether or not a benefit certificate shall issue on my application, and as they act upon the written statements herein made, no information, statement, promise or knowledge had, made or given by or to the person soliciting, taking or writing this application, or by or to any person, shall be binding on the society, and I further agree that if I shall fail to comply with and conform to any and all the laws of the said supreme lodge of the Fraternal Brotherhood, whether now in force or hereafter adopted, that my benefit certificate shall be void."

The defendant also alleged that because of the false answers of the insured and the consequent breach of warranty the benefit cer-

tificate was null and void and should be canceled. By way of cross petition against the plaintiff, defendant alleged that plaintiff after the death of the insured had detached from the benefit certificate and collected an emergency coupon of $100, notwithstanding the fact that plaintiff knew that the policy had been obtained through fraud and that plaintiff was not related to the insured and was not entitled to any benefits under the policy. Defendant tendered into court the amount of the premium paid on the certificate and asked to have the certificate canceled. In the cross petition defendant also asked for judgment against plaintiff for the $100 collected on the emergency coupon.

To this answer and cross petition the plaintiff filed a general denial and further pleaded that the local treasurer of the defendant at Kansas City, Kan., had been informed by her when she cashed the emergency coupon that she was not a first cousin of the insured, but that notwithstanding this fact the treasurer made a written certificate at the time the coupon was cashed that she was a proper beneficiary and entitled to receive the payment of the coupon; that the treasurer of the defendant assisted her in negotiating the cashing of the coupon and that by reason thereof defendant should be estopped from maintaining its counterclaim.

This reply was filed on November 23, 1928. On January 8, 1929, the interveners filed an intervening petition setting forth that John Martinac was the husband of the insured at the time of her death and that the other interveners were her children. In the intervening petition they pleaded a certain clause in the by-laws of the defendant society reading as follows:

"*If designation fails.* If at the time of the death of a member who has designated as a beneficiary a person dependent upon the member, and the dependency so required shall be found not to have existed at the time of the designation, or if any designation of beneficiary shall fail for illegality or otherwise, then the proceeds of the said certificate shall be paid in accordance with the provisions of section 151 herein."

Section 151 of the by-laws reads:

"*Death of all the beneficiaries.* In the event of the death of all the beneficiaries selected by a member, if he shall have made no other or further disposition thereof, the benefit shall be divided equally among his widow and children, or her husband and children (in all cases children to mean as designated in class 2 of section 147), and if there be no husband or children of the deceased member, then the benefit shall be paid to the persons of the first class as listed in section 147, in which there are existing beneficiaries, the

persons belonging to the one class sharing the fund equally to the exclusion of the following classes."

The interveners alleged that they were proper parties plaintiff and entitled to judgment on the certificates.

To this petition the defendant filed a demurrer, which was overruled, and defendant then filed its answer to the intervening petition, which was substantially the same as the answer originally filed by defendant to plaintiff's petition. The answer also contained an allegation that the insured was not an insurable risk and was suffering from physical disabilities and infirmities on the date of the issuance of the certificate of membership.

The interveners then filed a reply, alleging that the insured, Mary Martinac, was born and reared in Austria; that she was unable to read, write or understand English; that she never directly or indirectly gave the answers, statements, representations or warranties alleged in answer to questions Nos. 7, 9 and 15, and did not authorize anyone to give or make them in her behalf; that the answers were written in by the agent of defendant; that after the application was filled out the insured was asked to sign; that the application was not read to her after being so filled out, notwithstanding the fact that the agents, Sam Taylor and Pete Harabisa, who were present, well knew that the insured could not read or understand English. The interveners allege that the name of Katie Jaklevic as cousin was inserted in the application either by mistake or by design and without the knowledge or consent of the insured; that she understood that at her death her daughter Mary was to be the beneficiary; that some six months after the issuance of the certificate, when the insured learned that the plaintiff, Katie Jaklevic, was named as beneficiary, she immediately through and by her daughters notified the agents of defendant to give them the necessary blanks upon which to make the change of beneficiary; that the agents stated they were out of the blanks, but would get them; that several requests were made for the blanks, but they were never furnished. The interveners specifically deny that the insured made any misrepresentations or breached any warranty made by her.

Upon the issues so joined the case was tried before a jury. The evidence showed that about a month before the certificate was issued the plaintiff, Katie Jaklevic, was talking to Mary Martinac, the insured. Mary Martinac said: "Well, I am an old woman and so are you. Why don't you take out some insurance on me, and I

will take out some insurance on you; at least two or three hundred on me; and then we will be safe." That Mary Martinac said she would not be able to pay for the insurance, but added: "You are good to me; I have credit with you; I buy things at your store and so on. You can take out insurance on my life for $10,000, if you want to; I will sign it." That several weeks later Mary Martinac asked Katie Jaklevic if she had gotten the policy and the plaintiff told her she had it.

It is undisputed that in the inception the arrangement by which the certificate was obtained was clearly a wagering contract. The beneficiary named did not have any insurable interest in the life of the insured and the policy was void so far as Katie Jaklevic was concerned. (*Thomas v. Connecticut Mutual Life Ins. Co.*, 124 Kan. 159, 257 Pac. 727, and cases therein cited.)

The lawsuit would end here except for the fact that, as set forth hereinbefore, one of the by-laws of the society provided for the substitution of other parties as beneficiaries if the named beneficiary "shall fail for illegality or otherwise." Under this clause of the by-laws and the other by-laws pleaded the interveners had a right to be substituted as beneficiaries.

The evidence clearly shows that the answers of the insured, as recorded in the written application, to questions Nos. 7, 9 and 15 were false and untrue. These answers were material, and, being false, taken in connection with the other statements in the application, constituted a breach of warranty on the part of the insured. A benefit certificate issued upon an application in which the answers are made warranties, as is done in the application in the case at bar, is invalid. (*Hoover v. Royal Neighbors*, 65 Kan. 616, 70 Pac. 595; *Steele v. Woodmen of the World*, 115 Kan. 159, 222 Pac. 76; *Lodge v. Order of United Commercial Travelers*, 125 Kan. 26, 262 Pac. 598.)

To meet this situation the appellees in their reply to defendant's answer and in their evidence undertake to bring themselves within the rule laid down in *Moreland v. Security Benefit Association*, 112 Kan. 587, 212 Pac. 93. In that case the court held:

"The defense to an action on a fraternal beneficiary certificate was that the deceased in his application for membership gave a negative answer to the following question: 'Have you been under the care of or consulted a physician or surgeon concerning yourself within five years? If so, what ailment, name and address of each physician and surgeon, and give dates.' It was conceded that the answer as it appeared was false and that the assured had consulted and

had been under the care of two physicians shortly before his application was made. Over defendant's objections, two members of the order whose applications were being taken at the same time and who sat near the deceased testified that they heard some of the questions asked the deceased and did not hear this particular question asked of him, and did not think it was read over to him before he signed the application. *Held,* that the evidence was admissible." (Syl. ¶ 2.)

"Over defendant's objections, the same witnesses were asked whether similar questions were read to them when they made their applications, to which they answered, 'No.' *Held,* the evidence was admissible for the purpose of throwing whatever light it might cast upon the manner in which the application of the deceased was prepared and signed, the weight to be given to the evidence being for the jury to determine." (Syl. ¶ 3.)

The appellees also rely upon the case of *Blades v. Insurance Co.,* 116 Kan. 120, 225 Pac. 1082, which follows the Moreland case, *supra.* The evidence offered by the appellees which they claim shows them to be within the doctrine of the Moreland and Blades cases is that offered on the trial by the daughter Mary, who testified that on January 17, 1927, she was present at her home when Taylor and Harabisa, the agents of defendant, and Dr. Robert Barker, who made the medical examination, asked to see her mother. She stated her mother came in and sat on the bed and Doctor Barker started to examine her; that he opened her dress and listened to her heart; that Harabisa questioned her mother in the Austrian language and wrote down the answers; that he did not read the questions to her mother from the application; he just asked her; that the daughter Mary was present throughout the questioning and answering; that she understood both English and the Austrian language; that neither Harabisa nor anyone else read the question to her mother, "Have you ever had any sickness, accident or surgical operation?"

"Q. Did they ask her that question in either language, that you recall? A. I don't remember."

"Q. Did they read to your mother this question: 'Have you ever been rejected, postponed or rated up for life, accident or health insurance, or have you had insurance canceled or renewal or reinstatement refused by this or any other company, society or association?' Did they read her such a question as that? A. No.

"Q. Did they ask her that in effect? A. Yes.

"Q. And do you recall what her answer was to that? A. Not that she knew of."

The daughter further testified that her mother asked them to name her (Mary) as the beneficiary. She did not at any point tes-

tify to what answer her mother made to question No. 9, "Are you now suffering from any disease?"

Analyzing the testimony and applying the doctrine of the Moreland case to it, we find that it does not come fully within the rule laid down in that case. As to question No. 7, the witness said she did not remember what answer her mother made. That is not testimony that the agent set down an answer different from the one her mother made. No testimony whatever was offered by the witness as to question No. 9 showing that the answer as it appears in the application was not the one given by the insured. Hence the answers as written in the application stand as to questions Nos. 7 and 9, uncontradicted and unimpeached and unexplained by any evidence tending to prove fraud or mistake in the setting down of the answers by the agent.

Now the question is, Did the evidence prove that the answers to questions Nos. 7 and 9 as they appear in the application were false? Both related to the condition of health of the insured, one as to the present state of her health and the other to the condition of her health in the past.

John Martinac, the husband of the insured, testified that his wife was sick about a year before she died and that a Doctor Braithwaite attended her. Doctor Braithwaite testified he treated her in the early spring and summer of 1926 for a dog bite; that later on in the fall of that year, in August and September, he again saw and observed her; that she was then suffering from heart and kidney disease; that she was somewhat dropsical; that he talked with members of her family and told them that in his opinion she would not live more than a year. (As a matter of fact, she did die about thirteen months later.) That the ailment she had when he treated her in September, 1926, was either a heart or kidney disease. Doctor Carey was the attending physician at her death. He began attending her in May, 1927. He gave the cause of her death as myocarditis, a heart disease, cirrhosis of the liver and interstitial nephritis.

It is quite apparent from the record that the insured's answers as they appear in the application to questions Nos. 7 and 9 were not true. She had been attended by a physician in September preceding the January in which she made the application. He found her suffering from heart or kidney disease and pronounced her incurable. He told her family she would not live more than a year. The phy-

sician who attended her at the time of her death called on May 9, a, few months after the application was made, found her suffering from heart disease and other ailments; so it is clear that the answers to questions Nos. 7 and 9 in the application were false as they are written. As previously stated, the record stands, as to these questions, uncontradicted and unexplained by any evidence showing that the answers as they appear in the application are different from those actually given by the insured to the agent who wrote the answers in the application. The certificate is, therefore, invalid. (*Green v. Annuity Association*, 90 Kan. 523, 135 Pac. 586; *Becker v. Surety Co.*, 105 Kan. 99, 181 Pac. 549; *Glasgow v. Woodmen of the World*, 107 Kan. 354, 191 Pac. 470; *Hiatt v. Woodmen of the World*, 107 Kan. 359, 191 Pac. 472.)

Other points are strongly urged by the appellant, among them our attention being called to a clause in the benefit certificate reading: "No obligation is assumed by the society prior to the date hereof nor unless on said date the member is alive and in sound health."

From a résumé of the testimony as hereinbefore set forth it is clear that the insured was not in sound health on the date of the issuance of the policy.

The appellees contend that the report of the medical examiner contradicts the testimony of Doctor Braithwaite and that defendant is estopped by the report of its medical examiner. In 37 C. J. 531 it is said:

"*Estoppel to dispute examiner's report.* The certificate of the examining physician is conclusive as to the state of health of applicant, unless the examiner's opinion was influenced by fraudulent representation of material facts, and this is a statutory rule in some jurisdictions. The fact that the examiner was incompetent or negligent is immaterial, since he is insurer's agent."

Had the examiner received truthful answers to questions Nos. 7 and 9 in the application his report might have been entirely different. With truthful answers to these questions to guide him he could have made a more thorough examination or made inquiry from the other physician who attended the insured. It cannot be presumed that the medical examiner was not influenced or misled by the answers. The condition as to good health has been frequently upheld. (*Miller v. Knights and Ladies of Security*, 103 Kan. 579, 175 Pac. 397; *Pickens v. Security Benefit Association*, 117 Kan. 475, 231 Pac. 1016.)

In view of the conclusion reached on the foregoing it is not necessary to discuss the answer made to question No. 15 and the testimony of the daughter relative thereto.

Inasmuch as the plaintiff, Katie Jaklevic, had no insurable interest, the judgment against her for the $100 obtained by cashing the emergency coupon was proper and should be affirmed. The tender of the premium made by defendant should be accepted.

The case is therefore affirmed as to the judgment against Katie Jaklevic, and as to the judgment in favor of the interveners the cause is remanded, with instructions to the trial court to enter judgment in favor of defendant, accepting the tender of defendant covering the premium paid, canceling the benefit certificate and entering judgment in favor of defendant for costs.