## ÆTNA LIFE INS. CO. v. KEPLER.
### No. 11762.

Circuit Court of Appeals, Eighth Circuit.

Jan. 2, 1941.

Berkeley Cox, of Hartford, Conn., and Ralph M. West, of Omaha, Neb. (Norris Brown and Robert A. Fitch, both of Omaha, Neb., on the brief), for appellant.

Wymer Dressler, of Omaha, Neb. (Robert D. Neely, of Omaha, Neb., on the brief), for appellee.

Before SANBORN and THOMAS, Circuit Judges, and DEWEY, District Judge.

SANBORN, Circuit Judge.

The Aetna Life Insurance Company on September 20, 1921, issued to James Paul Kepler, then a resident of Omaha, Nebraska, a yearly renewable, noncancellable disability policy, which called for an annual premium of $60 and provided for benefits of $300 a month in case of total and permanent disability. The insured brought this action in 1939 to recover such benefits, upon the claim that he became totally and permanently disabled in April, 1937, and that, by the terms of its policy, the insurer was obligated to pay him $300 a month from July 1, 1937, but had refused to do so.

The insurer's defense was that the policy was not in force in 1937; that it had lapsed for the nonpayment of the annual premium due September 20, 1933, and had never been reinstated. The insured admitted that the annual premium due September 20, 1933, was tendered to the insurer after the expiration of the 31-day grace period allowed by the policy for the payment of premium, and had been refused; but he asserted that the tender was made in accordance with a custom or course of dealing of the insurer, and that it was estopped to claim either the lapse of the policy or that the insured had failed to reinstate it. The issues were tried to the court, which found in favor of the insured. From the ensuing judgment, the insurer has appealed.

The essential facts are not in substantial dispute. The policy was a Nebraska contract. By its terms, payment of the annual premium on or before October 21 in each year was a condition precedent to the renewal of the policy. There was no default by the insured in the payment of premium from the date of the policy until 1926. The record of the insurer's General Agent at Omaha, through whose agency this policy was written, shows that the premium for 1926 was received on October 22, the day following the expiration of the grace period. The insured was then residing in Omaha, and it was customary for the soliciting agent who sold the policy to him, to collect the annual premium and turn it over to the General Agent. .The evidence does not show when, if ever, the soliciting agent collected the premium for the year 1926. The insured had no recollection of there being any default in the payment of premium for that year. The trial court found that the premium was paid October 22, 1926. That finding was justified by the evidence. In 1927, the insured, according to the record of the General Agent, paid $25 of the annual premium on October 15 (within the grace period) and the balance on November 30. In the years 1928 and 1929, premiums were paid on time. In 1930, the General Agent's record shows that he received the premium on November 6. No default occurred in the payment of premium in the years 1931 and 1932. On October 23, 1933, two days after the expiration of the grace period, the insured, who was then and for several years had been a resident of California, attached his check for $60 to the premium notice which he had received from the General Agent and which

advised the insured that his annual premium was due on September 20, 1933, and mailed the check and notice to the General Agent at Omaha. The General Agent received them on October 26, and mailed them to the Home Office of the insurer for advice. The insurer directed him to return the insured's overdue payment. The General Agent returned the check to the insured, and advised him that his policy had lapsed for his failure to pay within the grace period the premium due September 20, 1933. The insured mailed the check back to the General Agent with a protest. The General Agent again returned it to the insured, at the direction of the insurer. Again the insured sent it back to the General Agent, demanding that it be accepted and that his policy be kept in force, but the check was again returned to him. No further tenders of premium were made by the insured, but he would have paid premiums if the insurer had been willing to accept them.

In 1938 the insured wrote the General Agent stating that he had become totally and permanently disabled, and asking if there was not some way in which his policy could be reinstated. He was again advised that it had lapsed. Thereafter he brought this suit.

The policy contained the following provisions relative to reinstatement: "After any default in payment of premium this policy may be reinstated as provided in Standard Provision Number 3 at any time within six months from the date of such default on written application by the Insured to the Home Office of the Company and the payment of the defaulted premium, provided the Insured shall with such application submit evidence of insurability satisfactory to the Company."

Standard Provision Number 3 read: "If default be made in the payment of the agreed premium for this Policy, the subsequent acceptance of a premium by the Company or by any of its duly authorized agents shall reinstate the policy but only to cover accidental injury thereafter sustained and such sickness as may begin more than ten days after the date of such acceptance."

The court below found as facts: (1) that the insured became totally and permanently disabled in April, 1937; (2) that the insured in the years 1926, 1927 and 1930 paid, and the insurer accepted, premiums after the expiration of the grace period,

**4**

and that this amounted to a course of dealing between the insured and the insurer whereby the insured "was induced to believe that his rights were not being jeopardized by being a few days late in tendering the premium in the year 1933"; (3) that the insurer "declared said policy cancelled" and did not afford the insured any opportunity to reinstate his policy; (4) that the insured has been ready, willing and able to pay all premiums as they fell due.

The court below concluded: (1) that the insurer was estopped to claim a forfeiture of the policy for nonpayment of the premium due in 1933; (2) that the insurer was estopped to make any defense on the ground that the conditions of the policy relative to reinstatement were not complied with by the insured; (3) that the insured was entitled to the relief prayed for by him, including costs and attorney's fees.

The insurer challenges the trial court's determination (1) that the insurer was estopped from claiming that the policy had lapsed for nonpayment of premium and (2) that the insurer was precluded from asserting that the policy had not been reinstated.

■ The finding of the trial court that the insurer could not defend upon the ground that there had been no reinstatement of the policy is so ∙ clearly erroneous as to require no discussion. If the insured was claiming the reinstatement of the policy after lapse for the admitted default in the payment of premium, the burden was upon him to prove that the policy was reinstated. The insurer was not required to prove that the policy had not been reinstated. The insured, at the time his tender of the overdue premium was refused by the insurer, was advised by it that his policy had lapsed for nonpayment of premium. He was not told that his policy was cancelled or that it could not be reinstated or that any application for reinstatement which might be made would be rejected. His own testimony is that he did not apply for reinstatement in compliance with the policy; that he was not advised by the insurer that he could

apply for reinstatement; and that what he was endeavoring to do, after his overdue premium was rejected, was to induce the insurer to accept it and thus restore his policy. The evidence conclusively shows that the insured was not misled into believing that the policy was reinstated; and further shows that the insurer did not voluntarily relinquish any of its rights with respect to reinstatement.

If the policy in suit was in force in 1937 it was because the insurer, by accepting overdue premiums in 1926, 1927 and 1930, had engaged in a course of dealing with the insured which in the year 1933 caused him reasonably to believe that the insurer would not declare a forfeiture if his premium was received by the General Agent on or before October 26, 1933; and because the existence of that belief on the part of the insured produced the default upon which the insurer relies to defeat the insured's claim. The court below, in effect, found that the acceptance of the overdue premiums by the insurer in years prior to 1933 was a course of dealing which caused the default of the insured in the year 1933. The insurer contends that this finding is clearly erroneous. The insured contends that it is a finding of fact which should not be set aside by this Court.

■ Prior to the effective date (September 16, 1938) of the Rules of Civil Procedure, the findings of fact of a trial court, in an action at law tried without a jury, were as conclusive, upon review, as a verdict of a jury, and could not be set aside by the reviewing court if there was any substantial evidence to support them.[1] A different rule prevailed in equity cases. The findings of fact of the trial court in such cases were presumptively correct, and, unless clearly against the weight of the evidence or induced by an erroneous view of the law, would not be disturbed by a reviewing court.[2]

Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides: " * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to

---

[1] United States v. Gamble-Skogmo, Inc., 8 Cir., 91 F.2d 372, 374; United States v. Washington Dehydrated Food Co., 8 Cir., 89 F.2d 606, 609; Helvering v. Johnson, 8 Cir., 104 F.2d 140, 144.

[2] Johnson v. Umsted, 8 Cir., 64 F.2d 316, 318; United States v. United Shoe

Machinery Co., 247 U.S. 32, 41, 38 S.Ct. 473, 62 L.Ed. 968; Butte & Superior Copper Co., Ltd., v. Clark-Montana Realty Co., 249 U.S. 12, 30, 39 S.Ct. 231, 63 L.Ed. 447; Karn v. Andresen, 8 Cir., 60 F.2d 427, 429.

the opportunity of the trial court to judge of the credibility of the witnesses. * * "

The effect of Rule 52(a) was to establish a uniform standard for testing the validity of findings of fact in any case tried without a jury. The standard adopted was that which had always prevailed in equity.[3]

This Court, with respect to jury-waived cases, is no longer merely a court of error which considers only questions of law. It now acts as a court of review in all non-jury cases in accordance with the practice which formerly prevailed in equity appeals.

▌ The findings of fact of the court below to the extent that they are unsupported by substantial evidence, or are clearly against the weight of the evidence, or were induced by an erroneous view of the law, are not binding upon this Court.

▌ The applicable substantive law is that of Nebraska. It is a rule of law of that State that if an insurer has, by a course of dealing, induced an insured reasonably to believe that prompt payment of premium in accordance with the terms of a policy will not be required, and the insured acts upon that belief, the insurer will be estopped to claim a lapse of the policy for a failure of the insured strictly to comply with the provisions of the policy relative to prompt payment of premiums.[4] But occasional indulgences shown by an insurer to a policyholder with respect to prompt payment of premium do not, under the law of Nebraska, create an estoppel and do not have the effect of varying the terms of the policy with respect to the time when future premiums must be paid.[5] How many indulgences shown by an insurer to an insured with respect to the

---

[3] State Farm Mutual Automobile Ins. Co. v. Bonacci, 8 Cir., 111 F.2d 412, 415; Vol. 3, Moore's Federal Practice, p. 3115, et seq.; Simkins' Federal Practice, 3d Ed., p. 488. The Advisory Committee which assisted in drafting the new rules had this to say of the above quoted portion of Rule 52(a):

"The rule stated in the third sentence of Subdivision (a) accords with the decisions on the scope of the review in modern federal equity practice. It is applicable to all classes of findings in cases tried without a jury whether the finding is of a fact concerning which there was conflict of testimony, or of a fact deduced or inferred from uncontradicted testimony." (Note to Rule 52(a), 28 U.S.C.A. following section 723c).

Honorable William D. Mitchell, Chairman of the Advisory Committee, on October 27, 1938, in a lecture on the new rules, said with reference to this rule: "In subdivision (a) we find a very important rule. Findings of fact, that is, findings by a judge where a jury is waived or there is no right to a jury, shall not be set aside unless clearly erroneous, due regard being given to the opportunity of the trial court to judge the credibility of witnesses. Under the former federal system, a statute provided that where a jury is waived the findings of the court have the effect of a verdict and may not be set aside if there is substantial evidence to support them, whereas in equity practice the findings of a trial judge could be set aside on an appeal if clearly erroneous, due regard being given to the opportunity of the trial judge to pass on the credibility of the witnesses. You

had these two different rules under the old system. When uniting law and equity procedure it is desirable to have one rule applicable to all cases tried on the facts by a judge, so as to avoid preserving the distinction between law and equity cases. The Advisory Committee had the choice of recommending that the findings of the trial judge should be tested by the old rule applied in law cases where a jury was waived, or by the equity rule. We recommended the equity system be adopted, so now when a case is tried on the facts by a judge it makes no difference whether the case is one formerly cognizable at law or in equity. His findings have the same weight in both types of actions and can be set aside if clearly erroneous. They can be set aside if against the clear weight of evidence, even though there is some evidence that might support a verdict or findings in a law case under the old system." (Rules of Civil Procedure, Annotated, Appendix, page 199.)

[4] Peterson v. Cosmopolitan Old Line Life Ins. Co., 124 Neb. 792, 248 N.W. 312; Owens v. Travelers' Ins. Co., 99 Neb. 560, 156 N.W. 1078; Cook v. National Fidelity & Casualty Co., 100 Neb. 641, 160 N.W. 957; Smith v. Liberty Life Ins. Co., 118 Neb. 557, 225 N.W. 688; Everett v. Metropolitan Life Ins. Co., 129 Neb. 386, 261 N.W. 575.

[5] Parker v. Knights Templars' & Masons' Life Indemnity Co., 70 Neb. 268, 97 N.W. 281; Van Dahl v. Sovereign Camp, W. O. W., 130 Neb. 181, 264 N. W. 454; Wolski v. National Life & Accident Ins. Co., 135 Neb. 643, 283 N.W. 381.

payment of premiums after they are due will constitute a course of dealing upon which an insured may reasonably rely or will justify a finding of the existence of such a course of dealing, is uncertain, but we think that language [6] used by the Supreme Court of Nebraska in the case of Van Dahl v. Sovereign Camp, W.O.W., 130 Neb. 181, 264 N.W. 454, 458, 459, decided in 1936, indicates that the acceptance by an insurer of three overdue annual premiums in the course of twelve years, under the circumstances disclosed by the evidence in the instant case, would not constitute a course of dealing, a custom, a habit, or a practice which would estop an insurer from claiming a default in the payment of premium.

■ The acceptance in the past by an insurer of overdue premiums from an insured will not constitute a course of dealing upon which the insured may rely in failing to pay a premium when due, unless the previous acceptance of overdue premiums had become a custom, a habit or a practice. Unrelated acts of forgiveness of the occasional delinquencies of a policyholder do not ordinarily constitute a course of dealing. 29 Am.Jur., § 860, pages 657–659, and cases cited. Compare, Van Dahl v. Sovereign Camp, W.O.W., supra.

The evidence in this case shows that the insured did not usually or customarily or habitually default in the payment of his premiums. His custom or practice was to pay premiums on time. It was no more the custom of the insurer to accept payments of overdue premiums than it was the custom of the insured to make them. The insured did not testify that there had been any course of dealing between him and his insurer with respect to the acceptance of overdue premiums. His testimony was that he had no recollection of the acceptance by the insurer of any overdue premium except the premium for the year 1930, and that his recollection about that premium was that he had paid one-half of it within the grace period and the other half on November 6, 1930.

■ Another reason that the acts of the insurer in accepting three overdue premiums in years prior to 1933 could not, we think, be reasonably regarded as a course of dealing which would justify the insured in assuming that in 1933 he could safely neglect to pay his premium on time,

---

[6] The appellee contends, however, that the delay in the payment of the instalments of assessment was in accordance with the custom and practice of Henry E. Van Dahl, acquiesced in by the appellant, and extending over a period of years; that the appellant waived the requirement of the contract that the monthly assessments be paid during the month for which they were assessed; and that appellant is estopped from claiming any forfeiture growing out of such delay.

"This contention is well considered in Koehler v. Modern Brotherhood of America, 160 Mich. 180, 125 N.W. 49, 50, 136 Am.St.Rep. 424, as follows: 'It is said that the insured had paid 17 assessments, only 5 of which were paid on or before the date specified, and that this was evidence of a practice which misled plaintiff and excused promptness in payment, and that the court erred in refusing to charge the jury that if the insured had been misled by long continued course of conduct and so believed that a strict performance on his part was not necessary, the defendant could not insist on the forfeiture, and also in instructing the jury that, the insured not having paid his assessments within the time specified stood suspended and being suspended at the time of his death, no insurance could be recovered. We are of the opinion that the evidence did not justify the request made, and that the charge given was as favorable instruction as the plaintiff was entitled to. The defendant was not responsible for these delays. The supreme body was not in a position to know the exact dates of payment, and may never have known that there was a delinquency; but, even if it did and was willing to overlook such delinquencies and receive and treat the payments as seasonably made, this liberality should not be given the effect of waiving in advance subsequent delinquencies, thereby, in effect, abrogating the provisions of the contract and practically making a new one.' See, also, Sovereign Camp, W. O. W., v. Cameron (Tex.Civ.App.) 41 S.W.2d 283; Barganier v. Knights of the Maccabees of the World, 147 La. 409, 85 So. 57; Supreme Lodge v. Grijalva, supra [28 Ariz. 77, 235 P. 397]; Pickens v. Security Benefit Ass'n, supra [117 Kan. 475, 231 P. 1016, 40 A.L.R. 654].

"It having been determined that there is no liability on the part of appellant on the beneficiary certificate sued upon, the trial court erred in not sustaining appellant's motion for a directed verdict. The judgment of the district court is therefore reversed and the action dismissed."

is that, under Standard Provision Number 3 the parties to the contract of insurance agreed upon the effect that the acceptance by the insurer of an overdue premium should have. Because of that provision, the insurer could, without any misrepresentation, either accept or reject the tender of an overdue premium. If it was accepted, the effect was to reinstate the policy in accordance with Standard Provision Number 3. If rejected, the insured remained in default and the policy remained in a state of lapse. By accepting the overdue premiums in 1926, 1927 and 1930, the insurer did not hold itself out as being willing to accept overdue premiums in the future. It represented that it had reinstated the policy under Standard Provision Number 3. The insured could not reasonably accord to the acceptance of overdue premiums any greater effect than that provided for in the contract of insurance. See and compare, Parker v. Knights Templars & Masons Life Indemnity Co., 70 Neb. 268, 97 N.W. 281, 285.

There was, we think, no substantial evidence of the existence of any course of dealing with respect to the receipt by the insurer of premiums after the expiration of the grace period, or of any acts by the insurer which amounted to a representation that it would accept future overdue premiums.

One of the essentials of an equitable estoppel is a false representation made by the word or by the act of the person sought to' be estopped, and that essential we have just discussed. Another essential is that the party to whom the representation was made relied and acted upon the representation to his prejudice.[7]

There is no evidence in this case that the insured defaulted in the payment of the annual premium due in 1933 because of any act or acts of the insurer. As already pointed out, the insured's testimony is that he could recall but one default in the payment of any premium between 1921 and 1933. He did not testify that the acceptance by the insurer of an overdue premium in any year or years caused or influenced him to default in 1933. He does not say why he neglected to pay the premium on time in that year. The finding that the insured's default in 1933 was caused or induced by the acts of the insurer in accepting overdue premiums in the years 1926, 1927 and 1930 is without any support in the evidence and is based upon speculation and conjecture.[8]

It is true that there is in evidence one communication sent by the insured to the General Agent which contains a reference to the acceptance in prior years of overdue premiums. That is the letter which the insured wrote when

---

[7] Walker v. Ehresman, 79 Neb. 775, 113 N.W. 218. See, also, Peters Trust Co. v. Cranmore, 114 Neb. 491, 208 N.W. 635; Wiltse v. Bolton, 132 Neb. 354, 272 N.W. 197; Brisbin v. E. L. Oliver Lodge, 134 Neb. 517, 279 N.W. 277; Webber v. Ingersoll, 74 Neb. 393, 104 N.W. 600; Gallaher v. City of Lincoln, 63 Neb. 339, 88 N.W. 505; New York Life Ins. Co. v. Rees, 8 Cir., 19 F.2d 781; New York Life Ins. Co. v. Silverstein, 8 Cir., 53 F.2d 986.

In Vance on Insurance, 2d Ed., page 451, it is said: " * * * if either party to an insurance contract makes, by word or act, a false representation of fact with reference to the contract upon which the other, acting in good faith reasonably relies to his prejudice, he will not be allowed to make any claim under the terms of the contract which is inconsistent with such representation."

In Equitable Life Assurance Soc. v. McElroy, 8 Cir., 83 F. 631, 638, this Court said that an insurance company "may waive the payment of a premium when it is due, but the basis of waiver is estoppel; and unless the company does or omits some act whereby the assured has just ground to believe, does believe, and acts on the belief, that the corporation will make, continue, or restore a contract without the payment of a premium, there is no estoppel, and there can be no waiver." See, also, Chandler v. Royal Highlanders, 101 Neb. 223, 162 N.W. 642; Whitehorn v. Royal Arcanum, 131 Neb. 713, 269 N.W. 821; Peterson v. Cosmopolitan Old Line Ins. Co., 124 Neb. 792, 248 N.W. 312; Everett v. Metropolitan Life Ins. Co., 129 Neb. 386, 261 N. W. 575. See, 29 Am.Juris. § 860, pages 657-658.

[8] See and compare Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Stevens v. The White City, 285 U.S. 195, 204, 52 S.Ct. 347, 76 L.Ed. 699; Eggen v. United States, 8 Cir., 58 F.2d 616, 620; Massachusetts Protective Ass'n, Inc., v. Mouber, 8 Cir., 110 F.2d 203, 206, and cases cited.

he sent his rejected check back the second time. It is dated November 21, 1933. So far as pertinent, it reads as follows: "I am very sure that there have been times when the pay't was not sent exactly when due, in fact I have a letter some little time back from you stating that premium must reach you within a certain time as on that date you had to remit to the home office—this was considerably more than 31 days after date of policy."

The insured's testimony at the trial was that he had not received a letter from the insurer or its agents to the effect that payment of premiums could be made after expiration of the grace period. The letter of November 21, 1933, was received in evidence over the objection of the insurer that it was self-serving. The court below reserved its ruling. The letter was not competent evidence of reliance by the insured upon a custom of the insurer to receive overdue premiums, first, because it does not attribute the insured's default to any act of the insurer, and, second, because if it had attributed the default to an act of the insurer, it would have been a self-serving declaration and incompetent. "A man cannot make evidence for himself by writing a letter containing the statements that he wishes to prove." Leach & Co., Inc., v. Peirson, 275 U.S. 120, 128, 48 S.Ct. 57, 72 L.Ed. 194, 55 A. L.R. 457; Lucas v. Hamilton Realty Corporation, 70 App.D.C. 277, 105 F.2d 800, 805. An analysis of the insured's correspondence with the General Agent clearly discloses that the insured's complaint against the insurer was not for having been misled by it through its acceptance in prior years of past due premiums. In the insured's note of November 2, 1933, returning the premium for the first time, he wrote: "I have paid in many hundreds of dollars with never even a hint of a claim." In his letter of November 21, 1933, a portion of which is quoted above, he said: "I would like to know how you can take my money for years and then on a trifling technicality refuse it—what do I get for the several hundred dollars I have paid you?" In his letter of November 28, 1933, to the General Agent, he said: "After one of your dupes has paid into your treasury as many hundred dollars as I have he is entitled to some consideration." In his letter of October 11, 1938, he said: "Am writing again regarding the policy I had with Aetna Co.—a non-cancellable policy $60 per year premium, which I paid for many years and intended to continue but which you arbitrarily cancelled. * * * * Would it be possible by paying back premiums to have the policy reinstated so that I could derive some benefit from the many hundreds of dollars I paid in?"

The feelings of the insured with respect to the refusal of the insurer to accept the premium and its subsequent failure to direct his attention to the provision of the policy under which he might have been able to reinstate the insurance are understandable, and we can accept his estimate of the moral impropriety of the treatment accorded him by the insurer, but that cannot affect the result in this case.

The insured defaulted in the payment of the annual premium for the year 1933 through no fault of the insurer. That gave to the insurer the legal right to reject the insured's tender of premium after default. The insured did not apply for reinstatement in conformity with the policy and the policy was not reinstated.

The conceded facts which are contained in the evidentiary findings of the court below required a judgment for the insurer, appellant. The judgment appealed from is reversed and the case is remanded with directions to enter judgment for the appellant.