WOODMEN OF THE WORLD v. PRISCILLA LOCKLIN.

Decided March 5, 1902.

1.—Benefit Insurance—"Good Health."

Evidence considered and held to support a finding that insured was in "good health," within the meaning of the policy, at the time it was delivered to him.

2.—Trial—Special Issues.

It is discretionary with the trial court whether a case shall be submitted to the jury on special issues.

3.—Charge—Omission.

It was not error, in a charge defining the term "good health," as used in a contract of insurance, as not having any disease "of a serious nature" without further explaining what was meant by disease "of a serious nature," in the absence of a request for such explanation.

4.—Evidence Warranting Issue.

Evidence considered and held to warrant the submission to the jury of the question whether the insured was sick at the time his policy was delivered, also the question whether his illness, if any, was of a serious nature.

5.—Insurance—Good Health at Delivery of Policy.

A condition in contract of insurance avoiding it if insured was not in good health when it was delivered, did not make the policy void for a trivial illness, not affecting the risk, though it shortly developed into a disease causing death.

Appeal from Milam. Tried below before S. O. Jones, Esq., Special Judge.

*Brome & Burnett* and *Monta J. Moore,* for appellant.

*N. H. Tracy* and *Henderson, Streetman & Freeman,* for appellees.

COLLARD, ASSOCIATE JUSTICE.—Suit by appellee, Priscilla Locklin, against the Woodmen of the World, a mutual beneficiary association, to insure lives of members, chartered in the State of Nebraska, to recover upon a beneficiary certificate issued by the association to William H. Locklin, for the benefit of appellee, upon the death of Locklin, for $2000, to be paid in case of his death while in good standing, and also for $100 for a monument upon his grave, plaintiff alleging that the insured had complied with all conditions of the certificate which was delivered to him, he having died August 18, 1899. Defendant filed a general denial, and set up that, by the constitution of the order, its agents had no power to deliver the certificate to William H. Locklin, for that he was not in good health when it was delivered to him, and was in fact at that time sick, of which sickness he afterwards died.

Trial by jury and verdict and judgment for plaintiff for $21000, April 30, 1901, from which this appeal is taken.

We find the facts as follows, giving to the verdict its proper weight: The certificate sued on is a benefit certificate, issued July 31, 1899, by the Sovereign Camp, Woodmen of the World, to Sovereign William H. Locklin, member of San Gabriel Camp No. 734, located at San Gabriel, Texas, entitling him to participate in beneficiary fund to the amount of $2000, and $100 for a monument, payable at his death to his wife, Priscilla Locklin, by the sovereign camp. The certificate contained many conditions, among which is one stipulating that the sovereign camp shall not be liable for payments of benefits under it, until the beneficiary "had delivered to him his beneficiary certificate *while in good health,*" which conditions were made a part of the consideration of the contract as conditions precedent to the payment of benefits under it.

Locklin complied with all the conditions required by the certificate and the laws of the order, and no question is made as to the liability of the order, except that it is contended that he was not in "good health" at the time the certificate was delivered to him.

It was shown that Locklin had his benefit certificate in possession on the 7th day of August after its issuance, and that it had been delivered to him at that time, or possibly on the 5th of the month prior thereto. The testimony authorized the jury in finding that it was delivered at least on the 7th, at which time Locklin was in good health, within the meaning of the certificate.

Dr. S. M. Hubbard testified as follows: "I have not been engaged in the general practice of medicine for the last twelve months, but was a practicing physician at San Gabriel, in Milam County, in 1899. I was acquainted with W. H. Locklin, having known him since June, 1893. I was the family physician of Mr. Locklin. From the time I first became acquainted with him up to the 2d or 3d of August, 1899, the gen-

eral condition of his health was good. I never had any occasion to pre-
scribe any medicine for him before August, 1889. The first time I ever
prescribed for him was on the 7th day of August, 1899; if he ever com-
plained before that, I don't know it. I made an examination of him at
that time. It was nothing more than an ordinary bilious attack. I pro-
ceeded to treat the case, giving him a hepatic stimulant and tonic. There
was nothing peculiar about the case for several days. I next visited him
on the 9th. His condition then was just about the same as it was when
he first came to see me, only there seemed to be a little more engorge-
ment. He had gone to bed at that time, and there were no serious symp-
toms at that time. The next time I saw him was on the 12th, when he
and his father came to my house. The 12th was on Saturday. He came
for medicine and I prescribed for him. I next saw him on the evening
of the 15th, when I went to his house, having been sent for by the
family. At that time the engorgement seemed to be increasing, and his
condition seemed to be pretty serious. I stayed with him about an
hour that visit. When I left, I told him I would be back the next even-
ing, but the next morning, the 16th, they sent for me, and I went and
stayed all day. He was not in bed when I went to see him until the
morning of the 16th. As far as I know he was getting about all the
time until the 15th. On the morning of the 16th his condition was
critical. I notified the family at noon that his case was critical, and
that without a very radical change soon he would die, and asked for
counsel. He died on the 18th, the second day afterwards. The case
was nothing more than a bilious attack, but it terminated to be ob-
structed jaundice. The first attack that he had was common to the
country,—people had it frequently,—and I prescribed the same for him
that I did for others. In the majority of cases, the result of the pre-
scription is to arouse the secretions of the liver and everything passes
off all right and it cures the patient. In this case I could not get any
secretion whatever from the liver. I called in assistance on the 16th;
that was the first serious alarm that I had of the case. When I first pre-
scribed for him the symptoms were nothing more than a kind of dull,
heavy feeling; a person with a bilious attack feels sluggish and indis-
posed. In my opinion, it was not serious in the beginning. He did not
have any fever; he had a subnormal temperature. I took his tempera-
ture on the 16th. It continued about the same way from the first up
to the day he died. About noon on the day of his death, his temperature
came up. There were no symptome of serious disease that I detected
until the 15th, at least, or the 16th.

"Cross-examination: I first visited Mr. Locklin on the 9th of August.
I prescribed for him on the 7th. I don't know now whether he came to
me or whether he sent to me on the 7th. But I gave him medicine on
that day. I presume I saw him on that day. I would have known how
to prescribe for him if I hadn't seen him, as the party who came could
have told me what was the matter. In other words, the party sent
would guess and then I would guess; prescribing in that way would be

a sort of double guess, I reckon. My best recollection, however, is that he came to me and I examined him on the 7th, and from the examination I concluded he had a bilious attack and prescribed accordingly. If it had been simply an ordinary case of biliousness I suppose I could have cured it. The liver never did act from the time I first prescribed for him, and the obstructed jaundice on the 15th, as I found it, was the direct cause, from my judgment, from the failure of his liver to act. Obstructed jaundice is anything that will prevent the flow of the bile from the liver. Sometimes a stone brings about the condition that prevents bile from flowing from the liver. In this case I don't know the cause, as we did not hold a post mortem examination. I presume it was mucus or accumulated bile that lodged in the duct that leads from the liver, from the gall bladder to the duodenum. It was really an accumulation of the stuff that is thrown off from the liver into that duct. It was an obstruction of that duct in some way that prevented it from being cast off into the natural channel. That is my opinion of Mr. Locklin's condition. It was not the result of a stone. I am of the opinion that it was either mucus or coagulated bile. As far as I know Mr. Locklin was a stout, healthy man in every other particular. He was not an overly large man. He weighed something like 170 pounds when he was at himself. I don't know how long that duct had been locked up, but suppose that it had been no great length of time. In some cases those conditions may not be but a day or two before there is any symptom of obstruction, while in other cases it may be for months. From Mr. Locklin's general condition, being acquainted with him all the time, I do not think the accumulation had been there any length of time. I presume the obstruction had begun on the 7th, when I first prescribed for him. The obstruction of the duct proper might not have been at that time; there might have been coagulation in the gall bladder, and passed on into the duct from the stimulation the medicine gave, but I don't know that to be a fact. At least, one or the other condition must have prevailed at that time. The duct I have referred to is the ductus choliticus communicis. It carried bile from the gall bladder to the intestines; a little short duct, an inch and a half or two inches long. The canal in it is not larger than a knitting kneedle. I have no certain opinion as to how long prior to the 7th the duct was either dammed up or the coagulation had taken place in the gall. It may have been one day and it may have been longer. These cases come on from the improper action of the liver, and a person may be feeling well to-day, and take a little cold or something and to-morrow he is feeling a little bad. And they just come that way. When I first saw him, this condition must have existed prior to that time. I did not take his temperature on the 7th nor did I do so on the 9th; that is, I only took his temperature by feeling of him. I felt of him on the 8th. His temperature was not above normal; but I don't know whether it was subnormal or not. I could not say whether his temperature was subnormal on the 9th or not. He did not have any fever then, consequently did not take his tempera-

ture. The next time I saw him was on the 15th. I did not take his temperature on the 15th, as I saw that he had no fever. His temperature was not elevated at that time. The next day, the 16th, we took his temperature and it was subnormal two degrees. That was a dangerous symptom. If his temperature had been subnormal on the 9th, that would have been a dangerous symptom. I hardly think he had a subnormal temperature on the 9th. I presume it was normal then, as a man can't have a subnormal temperature many days. If he had a subnormal temperature on the 7th, it was not likely he would have lived as long as he did. I identify this letter shown me. It is my handwriting. It states the condition of Mr. Locklin on the days and at the times I visited him. This says something about the prescription given Mr. Locklin on the 7th. The reason of that is I wrote it before I posted my books. I well remember that the fifirst time that I prescribed for him was on the 7th.

"Redirect examination: When the duct is obstructed, instead of discharging bile into its natural channels it discharges it into the system. Jaundice means yellow. When a person is jaundiced, some of the symptoms are a yellow skin, and the whites of the eyes become yellow. When Mr. Locklin first came to me he was not jaundiced. Death may result in two or three days from the time the obstruction begins. As to the amount of bile that is discharged by the liver in twenty-four hours, it differs in different persons, and authors differ some in regard to it. It ranges from fifteen ounces to three pints in twenty-four hours. Average would be about a quart a day. If the flow were entirely obstructed for three or four days it would go to three or four quarts or possibly a gallon. It accumulates in the liver; the liver enlarges, and when the blood passes through the liver, there is a certain amount of the poisonous matter absorbed into the system and death may be caused by that through the urea. The urates are manufactured in the liver. Symptoms of uremic poison developed on the 17th. There had been no symptoms of that kind prior to that time.

"Recross-examination: In cases of obstructed jaundice, it does not always follow that the fluid or poison goes out through the system and makes appearance in the eyes and face right at the beginning. It takes some days before that occurs. The general system, when it can't throw off the false matter through the natural channels, will undertake to throw it off through the other channels, either through the skin or the kidneys, and there will be a yellow color in the eyes and face. Whenever it is taken up in the circulation it is distributed all in the system and the yellow cast appears in the skin. The uremic poison was the necessary result of the condition of his liver. The uremia in the case was originated from the liver trouble, as the urea was absorbed."

In support of the finding that the certificate was delivered to Locklin as early as the 7th of August, we cite the testimony of witness Glasscock, as follows:

"I live at San Gabriel, Milam County, and was acquainted with W. H.

Locklin during his lifetime.  I know M. E. Lincoln.  I am a member
of the Woodmen of the World, having joined the camp on August 2,
1899.  Mr. Locklin became a member of the camp the same night I
joined.  I suppose his health was good at that time, as I did not hear
him complaining any.  I knew Mr. Locklin all his life; we were raised
there together.  I think he was about 40 years old, and he was the health-
iest man we had in the neighborhood that I know of.  The camp was
organized that night, and we all went in as charter members.  He ap-
peared all right and was as jovial as the balance of us, and we had a
good deal of fun that night.  I received my benefit certificate the night
I joined.  I got mine from Mr. Willis, the organizer.  I don't think I
met Mr. Locklin any more until the 7th, at Mr. Lincoln's drugstore in
San Gabriel.  On the night the camp was organized Mr. Lincoln, the
secretary, was absent in Austin, and Mr. Willis delivered part of the
certificates that might, saying we would have them signed up by Mr.
Lincoln when he returned home.  He delivered mine that night and I
paid the money over, and he said I could have it signed by Mr. Lincoln
when he returned.  Monday I went over to Thorndale and bought a load
of lumber, and at noon, when I came back, the carpenter building my barn
told me he had forgotten to tell me I would have to have some nails, and I
went after some nails, and happened to think of my certificate and
thought I would get Mr. Lincoln to sign it.  I went to the drugstore,
and Mr. Locklin was sitting on the counter.  Mr. Locklin's certificate
was not delivered on the 2d, but Mr. Willis said he would receive it in
a short time.  Just as I handed my certificate to Mr. Lincoln to be
signed by him, I asked Mr. Locklin if he had gotten his certificate.  He
said he had, and drew it out of his pocket, showed it to me, and asked
me if it was all right, and when Mr. Lincoln handed me mine back, they
were alike.  Mr. Locklin remarked, 'I have just had mine signed up.'
I was banker of the camp and hadn't received any money up to that
time.  It was, I reckon, a month before I received any money; we just
paid it over to Mr. Willis.  I didn't seee Mr. Locklin any more until
the day before he died, about the 17th I think.  I think the camp met
on Wednesday, the 9th, two days after I saw Mr. Locklin on the 7th.  I
think we met at the schoolhouse at San Gabriel on the 9th, and the next
meeting was at the church across the river on Saturday night, the 12th.
I can't be right certain, but it appears to me that Mr. Locklin was pres-
ent at the meeting on the 9th, but he was not at the meeting on the 12th.
Mr. Locklin was not in arrears of any dues or assessments.  He paid up
every cent on the night of the 2d.  Now I will explain a little there:
Dues are not due until the first of the month.  I was the banker of the
institution, but Mr. Willis received the money.  Mr. Lincoln, the secre-
tary, forwarded the money to the national lodge, and they refunded that
money and said they could not accept it until after the 1st of the
month,—that is the first dues, the monthly dues.  Locklin paid all that
was required on the night of the 2d.  My recollection is that Mr. Willis

received the initiation fee and the first monthly dues that night and turned over the money to Mr. Lincoln, who forwarded it, as I have stated. The national secretary returned the money, stating that he could not now receive it until the 1st of September. The membership, including Locklin, paid over to the constituted authorities all the money that was demanded; I saw Mr. Locklin pay his money. On the 7th, as stated, I went to San Gabriel for the purpose of getting some nails. I went to Mr. Lincoln to have him countersign my policy and he did so. I want to explain a little there; Mr. Lincoln dated the certificates the 2d, and the true date was the 7th. And after I got home I looked at mine and noticed it, and the next meeting I called his attention to it. 'Well,' he said, 'I did that so that all charter members will come up together.' I know that Mr. Lincoln signed mine on the 7th. We got into a discussion in regard to the date. When we referred to my certificate I told Mr. Lincoln he made a mistake in dating it the 2d. I said, 'You made a mistake in dating Mr. Locklin's the 2d.' I knew it was the 7th. Lincoln said, 'No, it was the 14th.' I said, 'No, it can't be the 14th. Now, I'll tell you what I'll do to make it certain; I will leave it to Mr. Elliott's books at Thorndale.' I told him I would refer to the books the first time I went to Thorndale, and I asked Mr. Elliott to refer to his books to see when I got the lumber and paid him $50, on the 7th or 14th, and he referred to the books, and the books showed I was there on the 7th, and I know that is why I could not be mistaken. As I have stated, I went to Thorndale on the 7th and got lumber and paid Mr. Elliott $50, and went home after dinner, and went to San Gabriel and met Locklin in the drugstore. If there was anything wrong with Locklin when I saw him in the drugstore, I could not see it. We were laughing and talking there about the Woodmen and some side degrees and the fun we had. He was apparently in his usual health.

"Cross-examination: I am a farmer. I think the conversation between Mr. Lincoln and myself with reference to the date of the delivery of the certificates and the signing of them by Mr. Lincoln was two or three weeks after the death of Mr. Locklin. The conversation did not occur after this suit was brought, it occurred long before the suit was brought. I think it may have been at the first meeting after Mr. Locklin's death. Mr. Lincoln contended that Mr. Locklin's certificate was delivered on the 13th and I thought it was on the 7th. I buy nearly all my lumber from Mr. Elliott, at Thorndale. I had been buying a good deal of lumber at that time. About that time I put up additions to my dwelling house and put up my barn. I could not tell you in regard to the number of loads I bought from Mr. Elliott about that time; I just hauled the loads as the carpenter needed lumber. My wagons went over there nearly every day. I think the carpenters were at work twenty or thirty days, and my wagons went over to Thorndale nearly every day. I sent part of the time, and part of the time I went myself for the lumber. I could not tell you the amount of my lumber bill at Elliott's during the

time the work was going on. It was not as much as $500. I think it was somewhere in the neighborhood of $400. I did a credit business with Elliott and paid him along at intervals. About that time I made more payments than $50. I think the time I have stated was the only time I paid him $50. I paid him off the final account, but don't remember how much it was—$20 or $30 may be. I could not tell, without referring to my book, when I paid Elliott the last payment. It was on the 7th of August that I had this conversation with Locklin in the store and he showed me his certificate. I don't know whether that was the day they worked the road or not. I used to work that road, but am over age now. I have heard that Locklin was overseer of that road. It was in the afternoon between 1 and 3 o'clock when I saw Mr. Locklin at the drug store. I could not say who was present besides Locklin, Lincoln, and myself. It appears to me like old man Davis was there, and I asked him about it, and he said he remembered about·being there and about us talking·about the Woodmen, but he could not be certain about the date. Mr. Davis is not a member of the Woodmen. I do not recollect that Locklin's father was with him that day. The order was organized on the 2d of August, at night, at the San Gabriel schoolhouse. To the best of my recollection we met next time on Wednesday, the 9th, that was also at the schoolhouse. That night there was some complaint raised about the order meeting at the schoolhouse on account of spitting on the floor, and we got permission to move to the church, and passed an order making it a fine to spit on the floor. The next meeting after the 9th was on the 12th, at the church. On the 9th we selected Wednesday night as the regular meeting night. Mr. Willis wanted to close the charter and we insisted on his closing that night, the 9th, but he said if we gave him a few more days we could get more members. He insisted on more time on the 2d and also on the 9th, and we gave him until the 12th to close up. The 12th was Saturday. Mr. Locklin was not there on Saturday night, the 12th; he was reported sick that night. If Mr. Locklin was present at the meeting on the night of the 9th, I don't remember it. To the best of my recollection, the only time That Mr. Locklin met with us was on the night of the 2d. I don't remember whether there was some of the certificates that had not been received at the time of the meeting on the 9th. I don't remember whether Mr. Willis got any new members from the night of the 9th to the 12th. He did not want the time extended until the night of the 12th in order to get all the benefit certificates back and delivered; he wanted to get more members. You see he gets so much money for organizing a lodge of twenty members, and if he does not he loses so much. On the night of the 9th, it appears to me like the membership was from fourteen to sixteen. I don't think he ever got the full quota of twenty. I signed my benefit certificate on the 2d, and Mr. Jenning, consul commander, signed it. Mr. Lincoln was gone to Austin that night and he signed it on the 7th, is my recollection. I signed and swore to

this proof of death before Mr. H. N. Roberts on the 9th of September, 1899. My recollection is that Mr. Locklin paid his dues and fees on the night of the 2d, and some other who got their certificates gave their notes for the amount, being trusted until the certificates came. My recollection is that Mr. Willis collected the dues and fees on the night of the 2d and turned the money over to Mr. Lincoln. I don't think any of the dues were paid to me as banker. This statement, which I swore to, says that the deceased last made payment on the 13th day of August, 1899, of assessment No. 105, amounting to $1.15. The date is a mistake, because the 13th is Sunday. I didn't get the date, but it was a mistake. I would not have signed the death claim and sworn to it without reading the statements in it, but that is a mistake. I don't suppose I thought it was a mistake at the time I signed it. The only way I can understand is just simply this: The death claim was dated and he is liable to report the payment any time, just like he made the mistake in sending the money up to the national order and it was turned back. I signed this in a hurry, and sometimes in signing up a paper that way I don't read the thing through, and I didn't notice that. This is the first time I ever took notice of the statement that he paid his assessment on the 13th of August. I don't know how that statement came in there, but it is a mistake of the man who wrote it. The day I signed this paper was only a short time after Locklin's death, but the facts would not be so fresh in the mind of a man that has business to attend to. That is my explanation in regard to this statement.

"Redirect examination: At the meeting at the church on the 12th it was reported to the lodge that Locklin was sick. That was the first I had heard of his being sick. Some one reported him as sick, and there was a general mention made of it that some one of us ought to go to see him. Mr. Ed. Kirkland spoke up and said, 'I'll go to-night, and after to-night, if he is sick, we will appoint a committee to wait on him.' It appears to me like Locklin died before we had time to get together and appoint a committee. Several members went to see him, however. I think Mr. Roberts prepared this proof of death. I don't know why he inserted the 13th day of August as the date of payment. Part of this is not in Mr. Roberts' handwriting. It must be Mr. Lincoln's handwriting. I say that the date of the 13th is a mistake, because August 13, 1899, was Sunday and the lodge did not transact business on Sunday."

Mrs. Locklin testified that her husband, the member, died August 18, 1899, and "my husband was overseer of the road of the week commencing August 7th, and died the next week. He worked on the road on the 7th day of August. I don't know that my husband was in bad health on the morning of the 7th, but he was a little puny that morning. He was down on the road all that day. He came home for his dinner." The foregoing testimony is stated in support of our conclusion that Locklin was in "good health," within the meaning of the terms of the policy, on the 7th of August, at which time he had possession of his

benefit certificate, and at which time it had been delivered to him by proper authority of the order. The testimony justifies the verdict on the question of "good health" under the charge of the court.

*Opinion.*—1. It was discretionary with the trial judge, whether he should submit the case to the jury on special issues, as requested by defendant. Gen. Laws 1899, 190; Railway v. Jackson, 54 S. W. Rep., 1023. The assignment of error upon the question is overruled.

2. It was not error to refuse a charge asked by defendant directing the jury to find for defendant.

3. It is claimed by appellant that the court erred in instructing the jury in the following language: "Upon the law of the case you are instructed that if at the time the benefit certificate in question was delivered to W. H. Locklin he was in good health, then plaintiff is entitled to recover. In this connection you are instructed that by being in good health is meant that, at the time of the delivery of the benefit certificate, W. H. Locklin did not have any disease of a serious nature." It is urged that the portion of the charge indicated is erroneous in this; that unless the deceased was affected, at the time the certificate was delivered to him, with any disease or sickness of a serious nature, they are to find for plaintiff; but nowhere are the jury instructed as to what is a sickness of a serious nature, and of this they are left to conjecture, without guide or direction from the court. "The uncontradicted evidence," the assignment declares, "shows that the sickness or disease with which he was affected at the time the certificate was delivered to him, while not at the time apparently of a serious nature, really culminated in his death. The uncontradicted evidence also shows that the certificate was delivered to deceased on the date plaintiff's witnesses testified to its delivery, and the plaintiff seeks to fix the time of delivery, to wit, on the 7th of August, 1899, a time deceased was affected with a sickness known as biliousness and not probably an illness considered by the jury as a disease of a serious nature, but which illness brought about and superinduced an illness that culminated in his death." If the charge needed further explanation, as claimed by defendant, as to what "a disease of a serious nature was," defendant should have asked an instruction upon the point to raise the question intended. The issue submitted by the court is simple, and the jury must have understood it in the proper sense, and we can not see that they were misled by the court's charge.

It is also assigned that the court erred in the instruction: "But if you believe from the evidence that W. H. Locklin at the time said beneficiary certificate was delivered to him was not sick, then you will find for plaintiff." Appellant argues that this part of the charge is erroneous, because the uncontradicted evidence shows that Locklin was sick when the certificate was delivered. We do not find any error in the charge objected to. The evidence warranted the charge, and it was not improper to submit the question.

Again, the following part of the court's charge is attacked by assignment of error: "Or if you believe from the evidence that at the time the beneficiary certificate was actually delivered, the said W. H. Locklin was unwell, but that the illness was not of a serious nature, and did not affect the risk or the probable duration of his life, then you are instructed that within the meaning of the conditions of the certificate said Locklin was in good health." Appellant claims that the charge is not supported by any evidence, as it was shown that he was affected at the time by a disease which brought on his death. And again it is claimed that charge does not define an illness of a serious nature or the phrase "risk to be assumed," or who assumed it, and is calculated to impress the jury with the idea that it was some duty assumed by deceased, and that the charge is confusing, unintelligible, and unsupported by any evidence, and the charge did not explain what was meant by illness affecting the duration of life, but left the jury to infer that although deceased may have died of an illness different in name from the illness affecting him at the time of the delivery of the certificate, yet which was produced by the very illness he did have at the time of delivery, they should still find for plaintiff, there being evidence tending to show that he was affected with an illness not precisely the same as that which caused his death, but that he was affected with illness at the time of delivery of the certificate which produced and ran into the illness which caused his death.

The assignment is not well taken. It was not error to fail to define what was meant by a disease of a serious nature, further than was stated by the court's charge as an illness that did not affect the risk.

We do not find other criticisms of the charge well taken, nor that the result of the trial should be changed on that account. If deceased was not well at the time the certificate was delivered, but such illness did not affect the risk, and was not included in the policy rendering it void or uncollectible, such illness would be immaterial and not available as a defense. A trivial illness such as does not affect the risk would not under this policy be construed to defeat its collection, in case of subsequent death. Life Association v. Bozeman, 52 S. W. Rep., 94; Society v. Reutlinger, 25 S. W. Rep., 837.

It is shown by the testimony that if Locklin was sick at the time that the policy or certificate was delivered to him, the illness was not serious; that he was not prevented from attending to his business or his duties as road overseer; and the jury were authorized to conclude that such ailment did not result in his death, but that death was caused by a change in his sickness after the delivery of the policy.

The court correctly informed the jury as to the meaning of the term "good health" as used in the certificate; and that if they should find that Locklin was unwell when the certificate was delivered to him, but that his illness was not of a serious nature, and did not affect the risk assumed or the probable duration of life, then within the meaning of the certificate and the terms of the contract he was in good health. The

charge asked by appellant on the subject was not correct and was properly refused. The court's charge was sufficient, and the jury upon satisfactory evidence having determined the issues in favor of the plaintiff, the verdict should not be disturbed.

We have considered every question raised by the brief of appellant, and find no cause for reversing the judgment, and it is affirmed.

*Affirmed.*