SOVEREIGN CAMP, W. O. W., v. DERRICK.

No. 1158.

Court of Civil Appeals of Texas. Eastland.

Oct. 6, 1933.

Rehearing Denied Nov. 10, 1933.

Turner, Seaberry & Springer, of Eastland, for appellant.

R. N. Grisham and J. A. Lantz, both of Eastland, for appellee.

CONNER, Special Associate Justice.

Mrs. Alice E. Derrick instituted suit in the district court of Eastland county against the Sovereign Camp, Woodmen of the World, for recovery on two beneficiary certificates, one for $1,000 and one for $2,000, issued to her husband, James E. Derrick, on April 7, 1904, and April 14, 1919, respectively, and in each of which plaintiff was named beneficiary.

James E. Derrick died on November 5, 1931, as a result of "Metastatic Melano Sarcoma." All insurance premiums and assessments were regularly paid from the date of the respective certificates until May and June, 1931, when by reason of default the insurance was automatically forfeited as of date June 1, 1931, under the terms and provisions of the constitution, laws, and by-laws of the association. On July 28, 1931, Mr. Derrick paid all assessments in arrears, including that for July, and he thereupon became reinstated and his insurance became effective, subject to a warranty on the part of the assured that he was then and would remain for thirty days thereafter "in good health."

Only two assignments are urged on this appeal, one to the effect that there is no evidence of probative force in the record to sustain the judgment of the trial court in favor of appellee; and one, that such judgment is contrary to the great preponderance of the evidence and is manifestly wrong and unjust. The trial was before the court without the intervention of a jury, and there are no specific findings of fact or conclusions of law embraced in the record. It was admitted by counsel for each of the parties to this appeal in their oral argument upon submission that if James E. Derrick was shown by the evidence to be in fact "in good health" on July 28, 1931, and remained in such condition for thirty days thereafter, the trial court's judgment should be affirmed, otherwise, the same should not be permitted to stand.

It has been announced many times by the Supreme Court that in such attacks on the trial court's judgment it is not the province of the Court of Civil Appeals to substitute its judgment for that of the trial court, unless it might be said that the facts and circumstances are such that but one reasonable conclusion can be reached which would result in a different judgment, or expressed differently, only in the event there is no evidence of probative force to sustain the trial court's general findings of fact may it be said,

as a matter of law, that the judgment should be set aside. Another well-recognized rule is that the facts and circumstances and all reasonable deductions therefrom must be considered most favorably in support of the trial court's judgment, but mere speculation and conjecture should not be indulged. With these fundamental rules as a guide, it at once becomes important to determine the condition of James E. Derrick's health on July 28, 1931, and for thirty days thereafter. In arriving at a correct conclusion as to the then health of Mr. Derrick, it becomes necessary to first determine what the expression "in good health" means as that term is used in the constitution, laws, and by-laws of the order.

In an approved definition of the term "sound health" by the Commission of Appeals, and which expression has been held to be synonymous with that of "good health," it is said not to mean perfect health, nor absolute perfection, but "is a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, that is, that the insured be not afflicted with a disease or bodily infirmity of a substantial nature, which affects the insured's general health, or which materially increases the risk to be assumed by the insurer." Vann v. National Life & Accident Insurance Co. (Tex. Com. App.) 24 S.W.(2d) 347, 349; Pickens v. Security Benefit Association, 117 Kan. 475, 231 P. 1016, 40 A. L. R. 654, and annotations.

We do not understand that a disease or ailment which affects the general soundness and healthfulness of the human system seriously to embrace an "affection even though curable only by medical or surgical treatment, but nevertheless readily remediable and so not necessarily tending to shorten life, before it has become so far developed as to have some bearing in præsenti, upon the general health." Cady v. Fidelity & Casualty Co., 134 Wis. 322, 113 N. W. 967, 971, 17 L. R. A. (N. S.) 260. And such affection would not constitute a bodily infirmity of a substantial nature, nor materially or necessarily increase the risk of the insurer, nor could it be said such an affection constituted bad health. Hence the very time of the inception or the beginning of the ravages of the terrible disease with which James E. Derrick died, is all important in this case as there is no room for doubt but what he died as a direct result of metastases from a melano sarcoma.

The plaintiff and her two daughters who resided with the deceased during the year 1931, and who were in a better position to daily observe his physical condition than others, testified in effect: Mr. Derrick had just an ordinary and painless mole on his shoulder all his life. In June it bled some as a result of being rubbed with a towel, it being first noticed in July to be slightly enlarged,

but still gave him no pain and was not inflamed. During the first part of August he went to see Dr. Blackwell who informed him that it was a bloody mole. A week or so later he went to see Dr. Kuykendall who also informed him it was a bloody mole, stating that he would burn it out and would then be through with it. On that occasion he cauterized or burned the tissue out with electric scissors. This was about the middle of August. Dr. Kuykendall described the place as a bleeding tumor about the size of a pea from which the assured suffered no pain. Later Mr. Derrick returned to the office of Dr. Kuykendall, who having found that the mole had recurred, excised it. The doctor fixed this date as of August 20th, when he dressed the wound and stated that he could not say that Mr. Derrick then had melano sarcoma, or that he had it at any time prior to that date. Dr. Kuykendall testified that the assured returned again on August 27th when Dr. Lauderdale was called in and that they were then of the opinion that Mr. Derrick had melano sarcoma, or a twin sister to a cancer. Dr. Lauderdale did not testify. Dr. Kuykendall testified that this was the last time he saw Mr. Derrick, but later upon being recalled stated that upon re-examining his records, this occasion was on October 20th instead of August 27th. Mrs. Howell testified that her father went to Dr. Kuykendall four times instead of three as first testified to by Dr. Kuykendall. She said the first time was when the mole was cauterized, the second, when it was excised, the third, when her father went to have the stitches removed from the wound, but which was not then done, and the fourth, on October 19th, instead of the 20th, as fixed by the doctor. It was on this last occasion when the doctor re-examined the affection on Mr. Derrick's shoulder, took out the stitches, and informed him the wound was then cancerous. So the trial court was justified in fixing that date rather than August 28th or a prior date as the time of the origin of melano sarcoma. But Dr. Kuykendall testified that he never definitely determined that Mr. Derrick had melano sarcoma until after the autopsy.

From Dr. Blackwell's testimony it appears in substance: Mr. Derrick and a lady went to his office two or three weeks before Mr. Derrick died on November 5th. He did not treat him professionally and made no record of the visit. The assured was not then emaciated and appeared to be well, though he at that time had a lump under his arm pit, and the doctor probably advised Mr. Derrick to have the mole cauterized. The day Mr. Derrick went to Waco, which was on November 3d, Dr. Blackwell was at the former's home and then found him desperately sick with an enlargement under his right ribs. At that time the doctor considered the assured had a malignant growth in his liver or gall bladder, but there was no great change in his physical condition. He said, "Neither carsonoma or sarcoma are ordinary malignant growths," and further, that all moles do not develop melano sarcoma, and until a malignancy developed the presence of a mole on the body would not necessarily render a person in bad health, nor would a bloody mole necessarily develop into sarcoma, nor would he pronounce a bleeding mole necessarily a melano sarcoma. He said, "I don't know when I would call it—when it was melano sarcoma."

There were two death certificates, one by Dr. Wood and one by Dr. Allen, neither of whom saw Mr. Derrick prior to November 3d. The duration of the cause of the assured's death was fixed by the former at about seven months and by the latter at about eight days. though they each stated therein that the first symptoms appeared in April, 1931, and that the cause of the disease resulted from an irritation of the mole the same month, though Mrs. Derrick testified that the mole bled for the first time in June, and Dr. Kuykendall testified that it was first cauterized in August. Dr. Allen did not testify, but Dr. Wood did by deposition which is to this effect: Upon his examination of the assured on November 3d he appeared to be a well built man and his "musculature was good." His shoulder did not look bad, only a small aperture appeared as later revealed from a diagnosis. There was very little tenderness around the mole area, the liver was greatly enlarged, and his breathing was bad. From that examination he was then satisfied he had sarcoma, but was not sure of melano sarcoma until a further examination on the next day when he was suffering from the metastases caused by melano sarcoma. On account of ointment having been put on the shoulder, he was unable to get a clear idea what the tissue looked like, and the ointment probably caused the skin to break over the area about the size of a dime or nickle. Mr. Derrick told this doctor that he had had "some little skin trouble" on his shoulder for some time but had not considered it of any great importance, and had not felt very bad for more than a couple of weeks, in fact, that he had worked up until October 31st. Mr. Derrick told him that he did not but slightly regard the little trouble with his shoulder and did not consider his condition serious until he saw Dr. Blackwell, which was evidently just prior to the time Mr. Derrick left for Waco on November 3d. Dr. Wood said, "Melano sarcoma usually starts with a very slight mole * * * and usually when it first starts it is very small. It never starts to grow any more, maybe for several years, or may stay in a quiescent state until some irritation comes along, and even then it might grow slowly, but when it starts to grow wild, it often finishes a patient in just a few days. It travels rapidly. * * * Melano sarcoma has small cells * * * and they

multiply * * * as well as permitting themselves to break off * * * and once they are in any organ * * * in the lungs or liver * * * they multiply from that place, and maybe begin by a metastases from the place, so a melano sarcoma, at its very beginning, could hardly be called a melano sarcoma because it may remain there rather quiescent, if undisturbed in any way, for a long time, but some time when it becomes irritated it will develop and travel and multiply very rapidly. Some of these cases have been known to be fatal within fifteen days from the time they were first diagnosed or from the time they were first suspected. In fact, a melano sarcoma at its very earliest stage is practically never diagnosed." He stated that sarcoma might have been dormant in deceased as late as August and September, and then progressed so rapidly as to have resulted in his death. Judging from the physical condition that Mr. Derrick was in even when Dr. Wood saw him and from the progress of the disease, he stated that its invasion must have begun "a very short while" before his death as a malignant invasion of the lungs and liver for the reason that such invasion of those organs could not remain in them without causing waste.

Dr. Klatt who performed the autopsy described the manner of making the same and then in effect stated: The first thing after this disease begins its malignant invasion, a patient usually notices a little soreness of the particular mole and following that "say the lungs are involved first * * * he may spit up a little blood, or have a little shortness of breath, or a little cough, with or without expectoration, depending on the extent of the involvement of the lung," and that as long as the moles remain dormant or inactive the man would ordinarily be regarded as in good health. The only other doctor testifying was Dr. Caton, who had never had a case as involved, and who gave his opinion based on a hypothetical question. His testimony is not in entire accord with the testimony of other doctors who attended Mr. Derrick as to the inception of the disease from which he died. At most it presented but an issue of fact.

From the testimony of some nine nonexpert witnesses it appears: Mr. Derrick never experienced any pain or soreness in the mole on his shoulder until the latter part of October. He was an unusually strong man, in good physical condition, performed very arduous labors nearly every day during August, September, and October, Mrs. Derrick testifying that during those months, with the exception of about nine days before his death, he seemed "as well and hearty" as at any time during his life. He never suffered any pain until the latter part of October and had firm muscles, a strong physique, and in every way manifested every indication of good health.

There is an absence of any evidence that Mr. Derrick had any of the symptoms of the fatal disease as described by Drs. Wood and Klatt other than a bloody mole on or prior to August 28th, and it was not until after the autopsy that they determined he had metastases of melano sarcoma. Dr. Wood was not willing to say Mr. Derrick had more than sarcoma when he first examined him on November 3d, and only pronounced the disease melano sarcoma upon a later examination. Woodmen of the World v. Locklin, 28 Tex. Civ. App. 486, 67 S. W. 331; The Homesteaders v. Stapp (Tex. Civ. App.) 205 S. W. 743; American National Insurance Co. v. McKellar (Tex. Civ. App.) 295 S. W. 628; and Vann v. National Life & Accident Insurance Co. (Tex. Com. App.) 24 S.W.(2d) 347.

While the trial court, under the evidence, might have been warranted in rendering a judgment in favor of appellant, and had he done so we probably would not have felt inclined to disturb the same, yet, we are unable to say that the only reasonable conclusion that could be drawn from the evidence would result in such a judgment, nor are we prepared to hold that the judgment as rendered is so contrary to the evidence as to render it manifestly wrong and unjust.

It is not at all certain that James E. Derrick was afflicted with melano sarcoma on or prior to August 28, 1931, but there is sufficient evidence of probative force to warrant the trial court's conclusion that the inception of that disease was at a much later date, and under the meaning of the term "good health," as we understand it, the judgment of the trial court should be affirmed and it is so ordered.

### On Rehearing.

Appellant in its motion for rehearing urges with considerable force that we were in error in not holding as conclusive the declarations of the beneficiary in the proof of death furnished appellant and to the effect that deceased was taken sick in May, 1931, with the trouble causing his death.

We are unwilling to announce such a binding rule as applicable to the facts in this case. Jones on Evidence (3d Ed.) § 296, announces that admissions in order to become conclusive must be either contractual in their nature or constitute an estoppel, and the declarations of appellee cannot be said to be either contractual in that sense or meet all the conditions constituting an estoppel, even had an estoppel been pleaded. Under the liberal rule prevailing in Texas that the judge or jury trying the case is clothed with the power to pass upon the weight to be given the testimony and the credibility of the witnesses, it is clear to our mind that no such rule should be available to appellant under the state of the pleadings and evidence in this case.

We have been unable to find any authorita-

tive Supreme Court decision directly deciding this question, but the case of Thornell v. Missouri State Life Ins. Co. (Tex. Com. App.) 249 S. W. 203, 208, deals exhaustively with the question of the admissibility of death certificates as a part of an insured's proof of death, and Justice Powell holds such statements have been almost uniformly held admissible and incidentally used this language as to the conclusive affect of admissions of this kind, "The only real controversy about the admissibility of such proofs of death is, as stated in many of the authorities, as to whether or not such proofs are conclusively binding upon the beneficiary. We are glad the Texas courts have adopted the more liberal rule to the effect that these so-called 'admissions by adoption' are admitted subject to explanation or contradiction." And Justice Speer in the case of Knights of Modern Maccabees v. Gillis, 59 Tex. Civ. App. 109, 125 S. W. 338, in discussing the admissibility and effect of such character of admissions, says, "It is not contended, *nor can it be*, that such representations are conclusive on the parties, but practically all the authorities agree that the proofs are admissible as representations, or 'admissions by adoption' as some of the writers put it, subject, however, to explanation or contradiction." (The italics are ours.) Of course, there could be no difference in principle as to whether such declarations are originals or declarations by adoption.

The motion is overruled.