**AMERICAN HOME LIFE INSURANCE COMPANY, Appellant,**

v.

**Teodora Barron ZUNIGA, Appellee.**

**No. 15698.**

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1955.

J. D. Wheeler, Bond Davis, San Antonio, Tex., Boyle, Wheeler, Gresham, Davis & Gregory, San Antonio, Tex., for appellant.

William P. Dobbins, William M. Porter, San Antonio, Tex., Porter, Vann &

Madalinski Dobbins & Howard, San Antonio, Tex., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

Appellee (plaintiff), Teodora Zuniga, as insured, recovered judgment upon jury verdict for $10,000.00 plus damages and attorneys' fees against appellant Insurance Company (defendant), upon insurance carried by it on the life of her husband. The main defense was that the husband had not been in good health when the policy was delivered to him; and that the Court below adopted the wrong delivery date. The jury, upon special interrogatories, found the facts in favor of appellee. The chief question is whether there was evidence sufficient to support those findings.

On February 5, 1953, appellee's husband applied for a fifteen year term policy and was examined by the Company's doctor February 10th. In due course the Company caused a special undercover investigation to be made about the applicant, his state of health, habits, etc., and a favorable report was made February 13th. The policy was delivered to the insured February 23rd, and the full premium of $316.20 was paid, and receipt issued.

After the delivery of the $10,000.00 policy had been completed the Company's agent suggested to the insured that it might be wise to split the insurance into two $5,000.00 policies with staggered premium due dates. This suggested arrangement was to the obvious advantage of both parties and appealed to the insured. By mutual consent, the $10,000.00 policy was turned over to the insurance agent solely for effecting those two purposes. The Company issued two $5,000.00 policies, one effective February 20th and the other March 20th. These new policies were mailed to the insured and were received by him about April 1st.

The $10,000.00 policy was retained by the Company, which wrote on its face: "3-24-53 Cancelled & Reissued under Pol. Nos. 56538-9 for 5 M ea. on same plan". Each of the $5,000.00 policies was inscribed with a typewritten notation that the $10,000.00 policy had been reissued in the form of two $5,000.00 policies.[1]

The application for the $10,000.00 policy contained provisions in fine print above insured's signature setting forth certain requirements concerning the good health of the insured at the time of approval by the Company's medical department or at the time of delivery of the policy.[2] A deposit of $25.00 was made

1. This notation appears on each policy in the following form (the $10,000.00 policy is numbered 56352):

"Reissued. Policies # 56538 and # 56539 are reissues of Policy # 56352 which is being canceled. Policies # 56538 and # 56539 are issued on the same plan—15 Yr. Term. Nonrenewable, Convertible, Ideal, D.I.—with a change in amount to $5,000.00 each and change of anniversary on Policy # 56539 to March 20, 1953. Policy No. 56352 was issued for an amount of $10,000.00 with effective date of February 20, 1953."

2. These provisions are as follows:

"If this application is accompanied by the first premium in cash and shall be approved at the home office of the Company, and a policy on the plan and for the amount applied for shall be issued while the applicant is alive and in good health, then the insurance shall be effective, subject to the terms and conditions of the policy from twelve o'clock noon of the day this application shall be approved by the Medical Department at the home office of the Company.

"If this application is not accompanied by the first premium in cash it is agreed that the Company assumes no liability whatever until a policy of insurance is actually delivered to me during my lifetime and while I am in good health, and any money, check, note, obligation or other thing of value, given to the Company or its agent, on account of the first premium on the policy applied for shall be held by the Company merely as a deposit and not as payment until such time as the policy of insurance is issued and delivered to me during my lifetime and while I am in good health, after which

with the application and the entire first premium was paid as above stated at the time the policy was delivered on February 23rd.

Photostatic copies of this application of February 5th were attached by the Insurance Company to the two $5,000.00 policies, this being done upon the election of the Company and without any agreement with the insured. No new application was executed, and the application attached to each of the $5,000.00 policies referred solely to the $10,000.00 policy originally issued and delivered.

The insured died February 12, 1954 of cancer of the esophagus. The first manifestation of this trouble disclosed in the evidence was on April 1, 1953, when insured consulted a physician because of difficulty he was experiencing in swallowing. Appellant introduced medical witnesses in an effort to show that, by reason of the assumed presence of the cancer, insured was not in good health on April 1st, when it claims the two $5,000.00 policies were delivered, or on February 23rd, when the $10,000.00 policy was delivered. Four doctors were introduced, three of whom had examined insured and the fourth testified as an expert upon hypothetical questions. Appellant further introduced the hospital records and appellee followed by placing on the stand the pathologist who made those records.

The Company's medical examiner testified that he examined insured at his home on February 10th, confining his examination to heart, lungs, kidneys and other vital organs, and that he did not make any examination by X-ray or any other means which would have disclosed the presence of the tumor beyond palpation of the abdomen. The examiner discovered no sudden loss of weight or other condition which would arouse suspicion that cancer was present.

The second physician, consulted by insured April 1st because of difficulty in swallowing, referred him to a specialist whose examination occurred promptly. X-ray examination disclosed the presence of a mass in the lower three inches of the esophagus which aroused the suspicion of the specialist, and he in turn referred insured to a surgeon. The latter performed a biopsy and excised several "bites" of living tissue from the esophagus. Pathological examination disclosed no cancer cells in those specimens, but this negative evidence was not considered final because the lower portion of the esophagus where the mass was situated could not well be reached because of swelling existing above it.

A resection was performed on insured August 13, 1953 and this mass was removed and submitted to a pathologist who examined the tissues microspically, and found that the mass consisted of an adeno-carcinoma of the lower third of the esophagus and extending into the stomach. The operation prolonged the life of the insured substantially six months.

Each of the four doctors was submitted to extensive direct and cross-examination and they agreed about the fact that the mass was malignant when removed August 13, that it occupied a portion of the esophagus and a portion of the stomach, that part of the tissues were dead when examined and that insured's death was produced by the cancer, the first evidence of which had been revealed by the April 1st examination. Only one of the four doctors, the one who had not made a physical examination of the insured and had not examined the X-rays or any of the tissues, testified definitely that, in his opinion, the tumor existed in malignant form on February 23rd. The others were unable to give a definite opinion as to the date of its malignant beginning. Nor did any give satisfactory evidence as to whether the tumor was of a fast or slow growing variety, whether it was benign or malignant on April 1st or theretofore; and they differed as to whether the growth origi-

the same shall be applied on such first premium charge; otherwise said deposit

shall be returned to me or my heirs, executors or administrators."

nated in the esophagus or in the stomach. It was also shown that the speed of growth varies with respect to the several types of tumors and that the rapidity of growth varies in different individuals.

It was developed from a half dozen lay witnesses that the insured was in sound health, working regularly and without complaint, to April 1st, and that he worked several days thereafter. There was no evidence of any loss of weight until after April 6th, at which time there was a rapid loss of weight noted by one of the doctors in his examination of May 18th.

The Court below submitted special interrogatories to the jury in response to which the jury found that the $10,000.-00 policy was delivered to and accepted by the insured and payment of the entire premium made prior to the time the policy was turned over to the Company's agent to be split into two policies; that the insured was in good health on February 23rd when the $10,000.00 policy was delivered; and that the insured was not in good health on April 1st when the two $5,000.00 policies were delivered. By appropriate procedural moves appellant raised the questions relied on for reversal. Appellant contends that there never was a delivery or acceptance of the $10,000.00 policy; that insured's rights are based entirely upon the two $5,000.00 policies, which were not delivered until April 1st, when the jury found insured was not in good health; and that there is no evidence to sustain the jury's finding that insured was in good health on February 23rd, when the $10,000.00 policy was delivered.

The first contention that the $10,000.00 policy was never delivered is devoid of merit. The Company's agent gave testimony which might tend to support that position, but it was wholly unconvincing and was directly disputed by a member of insured's family. That policy was admittedly turned over to the insured and read to him and full payment was made of a year's premium which the Company kept and used until after insured's death. It was plain from the evidence that the contract of insurance became effective February 23rd and that the policy was entrusted to appellant's agent for the limited purpose of making the two changes which related to unimportant details and left unimpaired the basic provisions of the contract. The facts covering this contention were submitted to the jury under special interrogatories and they were found in favor of appellee.

More serious is the challenge made by appellant concerning insured's state of health at the time this policy was delivered on February 23rd. In its pleading and its opening statement to the jury appellant charged that the insured made false representations in his application that he was in good health when he knew that he then had cancer. But the proof wholly fails to support that charge, and the real effort of appellant is directed towards establishing that the delivery of the $10,000.00 policy was ineffective under the language in the application that "the Company assumes no liability whatever until a policy of insurance is actually delivered to me * * * while I am in good health".

The Texas Courts are not aligned with the more liberal rule[3] that the quoted language extends only to vouching that there has been no unfavorable change in insured's health between the application for the policy and the delivery, but hold the policy void if the Company sustains the burden placed upon it[4] and assumed by appellant here of establishing that insured was not in good health at the delivery date.

There is substantial credible evidence from which the jury could have found this issue in favor of appellant. It be-

---

3. Cf. 44 C.J.S., Insurance, § 265, notes 63-67, p. 1066 and the cases assembled in an extensive note in 100 A.L.R. at pages 362 et seq.

4. Scharlach v. Pacific Mut. Life Ins. Co., 5 Cir., 1925, 9 F.2d 317. The Texas cases are discussed at length infra.

ing established that, on August 13th, a cancer was removed from insured's esophagus and stomach and that X-ray had revealed the presence of a mass at that point on April 1st (although the biopsy of April 6th failed to reveal malignancy), the jury could have found that the mass must have been present on February 23rd and must by then have become malignant and have attained such serious status as materially to increase the risk assumed by the Company, and not reasonably and readily remediable by the usual processes of surgery and medicine.[5]

■ But the jury could have found the other way either from the expert testimony or the lay testimony or both. The uncertainty of the experts as to the inception of the growth and as to its probable rapidity or when it probably became malignant; the lack of symptoms or loss of weight prior to the early days of April; these and the other circumstances detailed above were ample to support the finding actually made by the jury in response to interrogatories. Applicable Texas decisions, particularly the late ones, define tests liberal to the insured to be applied in deciding whether the jury's finding should be disturbed.

The Supreme Court of Texas had before it a case much like this one in Vann v. National Life & Accident Ins. Co., Tex.Com.App.1930, 24 S.W.2d 347, 350. Mrs. Vann, the insured, was issued a policy dated May 17, 1926 containing a sound health requirement practically the same as that here. The same defense was interposed as here and it was developed that Mrs. Vann had been treated for cancer of the uterus at intervals beginning March 29th and running through April 5th, a little more than a month before the application for the policy was made. She was treated with radium and X-ray because the cancer at that time had advanced so far that it was considered inoperable. She died of the same cancer February 7, 1927. The

jury in the trial court found that insured was in good health when the policy was delivered and the Court of Civil Appeals reversed, 11 S.W.2d 364. The doctor testified that Mrs. Vann led a normal life during the period when the cancer was arrested or retarded and he was of the opinion that, at the time of the delivery of the policy, the growth had been arrested. Whether it would recur he could not tell, but in September he found that it had recurred. From the fact of that recurrence, the doctor stated that it must have been active all along but it was possible that the first cancer had been arrested and that what killed her was a new cancer. The main evidence of good health at the crucial date was given by the husband and beneficiary. The Texas Supreme Court reversed the decision of the Court of Appeals and ruled that "there was sufficient evidence to raise the question as to whether or not Mrs. Vann was in sound health as the term was defined by the court at the time the policy in question was issued on the 17th day of May, 1926".

Sovereign Camp, W. O. W. v. Derrick was a cancer case decided by the Court of Civil Appeals of Texas, 1933, 64 S.W. 2d 982, 983. The crucial question involved the state of health of Mr. Derrick for the thirty days following July 28, 1931. The malignant growth which caused his death had its inception in a mole on his shoulder which bled some during the month of June and showed some enlargement during the month of July. A doctor was consulted during early August. There was further evidence that the mole had showed activity as far back as April, 1931. The very virulent type of cancer which sprang from this beginning took the life of the insured in November. A large number of laymen testified that the insured seemed to be free of pain and in good health up until October. A finding that the insured was in good health during the month of July was affirmed.[6]

---

5. See Sovereign Camp, W. O. W. v. Derrick and the other Texas cases discussed infra and the language quoted in Note 6.

6. The court used this language in defining what is meant by the term "sound health" or "good health": "* * * it is said not to mean perfect health, nor ab-

In Coxson v. Atlanta Life Ins. Co.,[7] the Texas Supreme Court reviewed a number of cases decided by the Courts of Appeal, including the Vann case, supra, of which it approved. It laid down rules governing the weight and worth of lay testimony when in conflict with the testimony of experts, and announced principles quite liberal to those brought into contest with insurance companies in cases such as that before the Court. There a policy was issued to a twenty-eight year old Negro March 3, 1941, and he died of pulmonary tuberculosis July 25, 1942. He was hospitalized about two months after the policy was issued, suffering from tuberculosis in an advanced stage, and he never left the hospital. He stated upon entrance to the hospital that he was unable to pay for his care as he had been sick for the past two and one-half years. The death certificate signed by the beneficiary showed that decedent had been confined to his home for about fourteen months because of illness, and it was the opinion of the attending physician that the tuberculosis could not have reached the serious stage discovered upon insured's admission to the hospital unless it had been active for about two and one-half years.

The lay testimony showed that the insured ate regularly, never seemed to feel bad, and appeared to be in good health. The Court of Appeals thought that this testimony was insufficient to overturn that of the experts and set aside a jury's finding that insured was in good health when the policy was delivered to him. The Supreme Court reversed, using in part this language: "The opinion testimony of experts, although persuasive, under most circumstances is not conclusive. It is peculiarly within the province of the jury to weigh opinion evidence, taking into consideration the intelligence, learning, and experience of the witness and the degree of attention which he gave the matter. The judgment and inferences of experts or skilled witnesses, even when uncontroverted, are not necessarily conclusive on the jury or the trier of facts, unless the subject is one for experts or skilled witnesses alone where the jury or the court cannot properly be assumed to have, or be able to form, correct opinions of their own based upon the evidence as a whole and aided by their own experience and knowledge of the subject of inquiry." That language was used after discussing with approval at least one cancer case and in connection with a disease whose diagnosis lies peculiarly with the experts.

The testimony was much more favorable to the insurance companies in each of the foregoing cases, and also in American Nat. Ins. Co. v. Ferguson, Tex.Civ. App.1948, 209 S.W.2d 797, a cancer case, and in Universal Life & Acc. Ins. Co. v. Barron, Tex.Civ.App.1954, 269 S.W.2d 467, an anemia case involving a policy issued without medical examination; and in each instance the appellate courts of Texas have sustained a jury finding of good health at the time of policy delivery. In the present case the verdict is supported not only by the lay witnesses, but by the conflicts between, and the uncertainties in the testimony of, the expert witnesses. We are not tempted to disturb the jury's findings in the light of these Texas cases.[8]

---

solute perfection, but 'is a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, that is, that the insured be not afflicted with a disease or bodily infirmity of a substantial nature, which affects the insured's general health,' or which materially increases the risk to be assumed by the insurer.' * * * * We do not understand that a disease or ailment, which affects the general soundness and healthfulness of the human system seriously to embrace an 'affection even though curable only by medical or surgical treatment, but nevertheless readily remediable and so not necessarily tending to shorten life, before it has become so far developed as to have some bearing in praesenti, upon the general health'."

7. 1944, 142 Tex. 544, 179 S.W.2d 943, 945, reversing Atlanta Life Ins. Co. v. Coxson, Tex.Civ.App., 1943, 177 S.W.2d 114.

8. Appellant contends that this question is ruled by our decision in Scharlach v. Pa-

The foregoing reasoning rejects also appellant's contention that its liability rests on the two five thousand dollar policies alone, and that the good health of insured should be tested by their delivery date which was about April 1st, and that the ten thousand dollar policy and its delivery should be ignored. That position proves too much, for the exclusionary language upon which its entire defense is based comes from the application which formed a part of the ten thousand dollar transaction. Moreover, it was undisputed that all premiums were paid in advance before the two five thousand dollar policies were orally applied for, which fact renders inoperative the language of the second paragraph above quoted in Note 2 which begins, "If this application is not accompanied by the first premium"; and brings the rights of the parties under the first paragraph which provides: "If this application is accompanied by the first premium * * *, then the insurance shall be effective * * * the day the application shall be approved by the Medical Department at the home office of the Company".[9] This approval date was prior to February 23rd.

Finding no reversible error in the judgment entered by the Court below, it is

Affirmed.

cific Mut. Life Ins. Co., 5 Cir., 1926, 16 F.2d 245. If that case were in conflict with the later Texas cases discussed above, it would have to yield to them. But we do not think there is conflict. In Scharlach, we emphasized that the evidence was *uncontroverted*, and further, the case came to us with a rejection of the sufficiency of that evidence by the trial court which had observed the witnesses as they testified.

Moreover, that insured died as the result of an extensive cancer operation three months after the policy was delivered and he had been examined and treated for a serious condition of anaema produced by the cancer for a period of sixty days preceding the delivery.

9. The date of issuance inserted in the two smaller policies was March 24th and the effective dates were February 20th and March 20th.